**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JEREMY RAY MORRIS; KRISTY MORRIS,

*Plaintiffs-Appellants*,

v.

WEST HAYDEN ESTATES FIRST ADDITION HOMEOWNERS ASSOCIATION, INC., an Idaho corporation,

*Defendant-Appellee*.

No.19-35390

D.C. No. 2:17-cv-00018-BLW

OPINION

Appeal from the United States District Court for the District of Idaho B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted June 5, 2020 Portland, Oregon

Filed June 17, 2024

Before: A. Wallace Tashima, Marsha S. Berzon, and Daniel P. Collins, Circuit Judges.

Opinion by Judge Berzon[*];
Partial Dissent by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Collins

## SUMMARY[**]

### Fair Housing Act

The panel affirmed in part and reversed in part the district court's judgment after a jury trial, and remanded, in Jeremy and Kristy Morris's action under the Fair Housing Act against West Hayden Estates First Addition Homeowners Association, Inc.

The Morrises alleged that the HOA discriminated against them on the basis of religion by attempting to prevent them from conducting a Christmas program. The jury returned a verdict in favor of the Morrises and awarded them compensatory and punitive damages. The district court granted judgment as a matter of law and alternatively granted a new trial or remittitur of the damages to the HOA. The district court entered a permanent injunction against future productions of the Christmas program that violate the HOA's covenants, conditions, restrictions, and easements, or CC&Rs.

---

[*] Judge Tashima concurs in the opinion with the exception of Parts II(a)(i)(2) and II(c).  Judge Collins concurs only in Parts II(a)(i)(2) and II(c).

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The Morrises contended that the HOA Board discriminated against them because of their Christian faith by discouraging them from purchasing a home in West Hayden Estates, interfering with the practice of their faith by opposing the Christmas program, and selectively enforcing the HOA rules. In Part II(a)(i)(1) of the opinion, affirming in part, the panel held that the district court properly granted judgment as a matter of law to the HOA as to the Morrises' disparate treatment claim under 42 U.S.C. § 3604(b) because they did not show that they were adversely affected by the HOA's actions. Agreeing with the Seventh Circuit, the panel held that discrimination against a member of a protected class in the interpretation and enforcement of HOA rules can violate § 3604(b). Here, though, the HOA's actions did not constitute enforcement of its rules, discriminatory or otherwise.

In Part II(a)(i)(2), reversing in part, the panel held that a reasonable jury could find that the HOA interfered with the Morrises' right to purchase and enjoy their home free from discrimination, in violation of 42 U.S.C. § 3617. The panel concluded that, viewing the evidence in the light most favorable to the Morrises, there was sufficient evidence supporting the jury's conclusion that the HOA Board's conduct was motivated at least in part by the Morrises' religious expression.

In Part II(a)(ii), the panel affirmed the district court's grant of judgment as a matter of law on the Morrises' claim that the HOA's toleration of threats and harassment targeted at the Morrises by other residents of West Hayden Estates violated § 3604(b).

In Part II(a)(iii), the panel affirmed the district court's grant of judgment as a matter of law on the Morrises' claim

that the Board's January 2015 letter, addressing their pre-closing inquiry about the Christmas program, violated § 3606(c), which prohibits making, printing, or publishing any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on a protected characteristic, including religion. Agreeing with other circuits, the panel adopted an objective "ordinary reader" standard. Applying this standard, the panel agreed with the district court that the HOA was entitled to judgment as a matter of law on this claim.

In Part II(b), the panel affirmed the district court's alternative grant of a new trial to the HOA as to the § 3617 claim. The panel concluded that the district court did not abuse its discretion in holding that the jury's verdict was against the clear weight of the evidence.

In Part II(c), the panel vacated the district court's grant of an injunction to the HOA. The panel reasoned that during a new trial on the Morris's § 3617 claim, the jury could conclude that the HOA was motivated in part by a discriminatory purpose in its interactions with the Morrises. If so, then simultaneously permitting an injunction against the Morrises could have the effect of sanctioning discriminatory reliance on the CC&Rs.

Dissenting in part, Judge Tashima concurred in the opinion with the exception of Parts II(a)(i)(2) and II(c). Judge Tashima wrote that the district court properly granted the HOA's motion for judgment as a matter of law on all the Morrises' claims because the evidence permitted only one reasonable conclusion: the HOA was concerned about the Morrises' holiday events because of the size and scale of the events, not because of the Morrises' religion. Judge Tashima

wrote that the district court also properly granted the HOA's motion for injunctive relief and did not abuse its discretion in alternatively finding that the HOA was entitled to a new trial and to remittitur.

Concurring in part and dissenting in part, Judge Collins concurred only in Parts II(a)(i)(2) and II(c). Judge Collins agreed with the majority's conclusions that the district court erred in granting judgment as a matter of law on the Morrises' claim under § 3617 and that this error prejudicially affected the district court's analysis of the HOA's counterclaim for injunctive relief enforcing the CC&Rs against the Morrises. Judge Collins wrote that the district court also erred by concluding that the judgment as a matter of law was warranted for the HOA on the remaining claims, as well as by conditionally awarding the HOA a new trial and remittitur.

---

**COUNSEL**

Allyson N. Ho (argued), Gibson Dunn & Crutcher LLP, Dallas, Texas; Katherine C. Yarger, Gibson Dunn & Crutcher LLP, Denver, Colorado; Jeremiah G. Dys and Stephanie N. Taub, First Liberty Institute, Plano, Texas; for Plaintiffs-Appellants.

Peter J. Smith, IV (argued) and Jillian H. Caires, Smith & Malek PLLC, Coeur d'Alene, Idaho, for Defendant-Appellee.

## OPINION

BERZON, Circuit Judge:

In 2014, Jeremy and Kristy Morris hosted a public Christmas program outside their home in Grouse Meadows, a neighborhood in Hayden, Idaho.  Soon after the event, the Morrises moved to a new home in West Hayden Estates, where they hoped to continue their newly minted tradition of producing a multi-day Christmas festival to raise money for charity.  Among other things, they intended to string up thousands of Christmas lights, sing Christmas carols, employ costumed Christmas characters including Santa Claus and the Grinch, and host a live nativity scene, complete with a real camel.

The Morrises' plan received a frosty reception from the Board of the West Hayden Estates First Addition Homeowners Association ("HOA").     The Morrises' Christmas program would likely violate the HOA's rules, the Board informed them.  After two years during which the Morrises did host the program, the Morrises filed this suit in federal court.  The Morrises accused the HOA of more than just being Grinches.  The HOA's conduct discriminated against them on the basis of religion, they maintain, in violation of the Fair Housing Act, 42 U.S.C. §§ 3601–3631 ("FHA" or "the Act").

The district court denied summary judgment, and the case went to trial.  The jury agreed with the Morrises and awarded them $60,000 in compensatory damages and $15,000 in punitive damages.  Post-trial, the district court granted judgment as a matter of law ("JMOL") to the HOA. We affirm in part and reverse in part.

## I.   Facts and Background

In December of 2014, Jeremy Morris posted on Facebook that he and his wife, Kristy, would be offering free hot chocolate to anyone passing through their neighborhood, Grouse Meadows, to look at the Christmas lights.  Within a day, an estimated 200 families had taken the Morrises up on their offer.  Over the following eight nights, between 20 and 100 families stopped by each night to see the Morrises' Christmas decorations, some driving through the neighborhood and others parking in a church parking lot across the street.  On one or two of the nights, a bus brought residents from a retirement home to see the lights and enjoy caroling.  Visitors to the Morrises' 2014 Christmas display enjoyed the thousands of lights on the Morrises' house, free hot chocolate, Christmas-themed characters in costume, caroling, and a live camel named Dolly.

Shortly after the holidays, the Morrises made an offer on a new home in West Hayden Estates.  Before closing, Jeremy Morris, with "the Christmas program in mind," requested a copy of the HOA's declaration establishing covenants, conditions, restrictions, and easements ("CC&Rs") to ascertain whether there would be any problem with hosting a Christmas event around the new home, similar to the 2014 production.  Jeremy Morris also contacted Jennifer Scott, president of the West Hayden Estates HOA to discuss a potential Christmas program.  He asked Scott to arrange a meeting of the HOA Board to address how the CC&Rs would impact the program, and to do so urgently.

Scott immediately scheduled an emergency meeting of the HOA Board, which the Morrises did not attend.  During the meeting, members of the Board looked up information about and watched YouTube videos depicting the Morrises'

2014 program on Facebook. After doing so, the Board was concerned that an event of that scale would not be consistent with the HOA's rules and covenants. At the end of the meeting, the Board agreed to send the Morrises a letter advising them that hosting the proposed Christmas program would likely violate the West Hayden CC&Rs.

The following day, former Board member Larry Strayer circulated a draft letter to the other members of the HOA Board. The letter stated that a program like the one planned by the Morrises would violate three sections of the CC&Rs: Section 5.4.1, which provides that properties in West Hayden Estates are not to be used for any purpose other than for single family residential purposes; Section 5.4.2, which prohibits nuisances, including any noise which would "interfere with the quiet enjoyment of any" neighbor; and Section 5.4.15, which instructs that any exterior lighting on an HOA home "shall be restrained in design" and that "excessive brightness shall be avoided." The letter also expressed concern about the increase in traffic that would likely accompany the Morrises' Christmas program. The draft letter concluded with two paragraphs that read:

> And finally, I am somewhat hesitant in bring[ing] up the fact that some of our residents are avowed atheists and I don't even want to think of the problems that could bring up.

> It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in any expensive litigation to enforce long standing rules and regulations and fill our neighborhood with the riff-raff

> you seemed to attract over by WalMart.
> Grouse Meadows indeed!!!  We don't allow
> "those kind" in our neighborhood.

After some back-and-forth among Board members, these closing paragraphs were revised to read:

> And finally, I am somewhat hesitant in bringing up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up.

> It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in any expensive litigation to enforce long standing rules and regulations and fill our neighborhood with the hundreds of people and possible undesirables.  We have worked hard to keep our area peaceful, quiet, and clean.  Neighbors respect the CC&R's and show common courtesy to those around them.  These are reasons why people want to live here.

The revised letter was mailed to the Morrises on January 16, and received January 21.

Undeterred by the HOA's response to their inquiry, the Morrises moved forward with their purchase of the West Hayden Estates home.  On January 27, Jeremy Morris met with the HOA Board.  He was joined by his realtor and, via telephone, an attorney specializing in issues concerning religious liberty.  In that meeting, the Board raised concerns

about traffic and the number of people who would attend the Christmas event.

The following month, the Board called a meeting of the full HOA membership.  In a letter to all HOA members announcing the meeting, the Board stated:

> A potential buyer is looking to purchase a home within the development.  He has requested approval to hold a holiday event that will last from 5–10 days during the month of December.  This display/event was held in another development last year.  In speaking with the gentleman, he has indicated that this "event" will produce in excess of 900 additional vehicles traveling through the neighborhood with up to 80 volunteers directing traffic and such.  He has indicated that he will be using a speaker/PA system from 6 pm – 9 pm nightly.  Last year, he incorporated a camel and various other amenities to attract attention to his display. . . .

> His comment to the media was that this year, he plans to create a much larger event. . . .

> It is the Board's opinion that while we encourage holiday decorating and community participation, this type of traffic and event is in violation of the CCRs for West Hayden Estates.

> The board is seeking your opinions on the matter as the individual has threatened legal

action if the board does not permit his request.

After this notice was circulated but before the meeting, Jeremy Morris sent a response letter to all members of the HOA. That letter read in part:

> [T]he HOA Board has engaged in discriminatory violations of the Fair Housing Act, and has rebuffed my attempts to resolve the situation quietly. My only desire is to exercise my rights as a homeowner, while respecting the rights of others, in the spirit of community, by celebrating my own Christian message which includes decorating for Christmas and raising money for charity. . . .
>
> My own read of the CCR's found nothing to prevent a Christmas event from taking place, and the opinion of other attorneys confirmed this. In sum, with no CC&R provision applicable to our Christmas event, the HOA Board then resorted to **religious discrimination**.

The letter also stated that the "Fair Housing Administration" was "investigating this incident."[1]

At the meeting, which took place in February of 2015, HOA members discussed the Christmas program and held a vote on whether the event should proceed. According to one Board member's trial testimony, the 19 HOA members

---

[1] There is no evidence in the record that any government agency investigated the Morrises' claims.

present (not including Board members) voted that they did not want the Morrises' Christmas program to take place in West Hayden Estates, but no formal action was taken as a result.  The following month, the Morrises closed on the West Hayden Estates home and moved into the neighborhood.

The residents of West Hayden Estates, including the Morrises, lived in apparent harmony until the fall of 2015, when Jeremy and Kristy began to set up Christmas lights in preparation for their "2nd Annual Hayden Christmas Light Show."  In October, the HOA Board, via their attorney, sent the Morrises a letter expressing concern that the planned event would not comply with local zoning ordinances and would violate HOA rules prohibiting nuisances, excessive lighting, and the keeping of animals other than "ordinary household pets."  The letter further stated: "Unless you request and receive written approval from the Association Board to conduct your planned event, the Board has authorized this office to file an action seeking an injunction to prevent your event from occurring."

The Morrises did not receive written approval but went forward with the event as planned.  For five nights leading up to Christmas, the Morrises surrounded their house with: an estimated 200,000 lights, thirty volunteers, costumed characters (representing, among others, the Grinch, Frosty the Snowman, Santa Claus, and Clifford the Big Red Dog), several musical guests, a children's choir, an antique cotton candy machine, charity tables, security personnel, a live nativity scene, and, once again, Dolly the camel.  Four commercial buses carried visitors to the event, and traffic supervisors directed visitors' cars through the streets around the house.  The HOA Board took no legal action.  The Morrises held a larger program in 2016, which had five

buses and 48 volunteers, and added four "hot chocolate elves" to the attractions.

In the meantime, the relationship between the Morrises and their West Hayden Estates neighbors grew tense. The HOA reportedly received complaints from West Hayden Estates residents regarding trash, traffic, and one incident of public urination by a child, all allegedly generated by the Christmas programs. On at least two occasions, Jeremy Morris became involved in public arguments with other West Hayden Estates residents. According to the Morrises, during one such argument, a West Hayden resident, Larry Bird, made threats against Morris.

December 2016 was the last time the Morrises hosted the event. In January 2017, the Morrises filed suit in federal court, asserting that the West Hayden Estates HOA violated §§ 3601, 3604(b), 3604(c), and 3617 of the Fair Housing Act, all prohibiting various forms of religion-based discrimination in access to housing. The HOA counterclaimed, asking the court to enjoin the Morrises from holding their Christmas program again in West Hayden Estates. After the close of discovery, the HOA moved for summary judgment. The district court denied summary judgment, explaining that, although the Board's January 2015 letter to the Morrises "may have been an attempt to offer some type of conciliation or recognition of sensitivity to others' religious beliefs," a jury could reasonably view that letter "as evidencing a discriminatory intent."

A six-day jury trial ensued. The jury heard testimony from the Morrises, members of the HOA Board, the Morrises' neighbors, and volunteers who helped the Morrises carry out their Christmas programs. Following deliberations, the jury completed a special verdict form on

which it found for the Morrises on each of their separate FHA claims.  First, the jury concluded that the HOA "discriminated against [the Morrises] at least in part due to their religion" both during and after the purchase of their home, in violation of 42 U.S.C. § 3604(b).  Next, the jury found that the HOA's January 2015 letter to the Morrises "expressed, in the mind of an ordinary reader, a preference that a non-religious individual purchase [the Morrises'] home," in violation of § 3604(c).  Last, the jury found that the HOA "threatened, intimidated, or interfered with [the Morrises'] purchase or enjoyment of their home," in violation of § 3617.  The jury awarded the Morrises $60,000 in compensatory damages and $15,000 in punitive damages.

After trial, the district court granted the HOA's motion for JMOL under Fed. R. Civ. P. 50(b).  The court held that the Morrises' claims rested primarily on the HOA's January 2015 letter, and that an ordinary reader would not view the letter as showing that the Board intended to discriminate on the basis of religion.  The court also determined that the HOA had been unfairly prejudiced when the jury heard evidence of alleged threats and harassment targeting the Morrises and that the weight of the evidence was against the Morrises, and consequently held, in the alternative, that the HOA was entitled to a new trial under Fed. R. Civ. P. 59, or to remittitur of the damages to a total of $4.  Finally, the district court concluded that the Christmas program violated the HOA rules and granted an injunction barring the Morrises "from hosting a Christmas program in the West Hayden Estates that violates the CC&Rs," including by decorating their house with lights visible from neighboring lots, using their house for any purpose other than as a single-family residence, interfering with the quiet enjoyment of

other homeowners, and keeping "livestock" on their property (in the form of a donkey and Dolly the camel).

The Morrises appealed. We affirm in part and reverse in part the district court's grant of JMOL, affirm the grant of a new trial, vacate the injunction, and remand.

## II. Discussion

### a. Judgment as a Matter of Law

The Morrises contend that the HOA violated three provisions of the Fair Housing Act: Section 3604(b), which makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. § 3604(b); section 3604(c), under which it is unlawful "[t]o make, print, or publish . . . any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . religion," *id.* § 3604(c); and section 3617, which makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected" by §§ 3603, 3604, 3605, or 3606 of the Act, *id.* § 3617.

We review the grant of judgment as a matter of law de novo, viewing the evidence in the light most favorable to the non-moving party, here, the Morrises. *Corbello v. Valli*, 974 F.3d 965, 973 (9th Cir. 2020). JMOL is appropriate "only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of*

*Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (internal quotation marks and citation omitted).

### i.    Discriminatory Treatment and Interference

The Morrises contend that the HOA Board discriminated against them because of their Christian faith by discouraging them from purchasing a home in West Hayden Estates, interfering with the practice of their faith by opposing the Christmas program, and selectively enforcing the HOA rules.

### (1) Section 3604(b) of the FHA

Section 3604(b) of the FHA prohibits discrimination on protected grounds, including religion, "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b). The provision creates a "broad and inclusive compass" entitled to "generous construction." *McGary v. City of Portland*, 386 F.3d 1259, 1262 (9th Cir. 2004) (internal quotation marks omitted) (quoting *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995)).

The HOA's CC&Rs are facially neutral, and the Morrises make no argument that they have "a significantly adverse or disproportionate impact on" Christians generally. *Comm. Concerning Cmty. Improvement v. City of Modesto* (*CCCI* ), 583 F.3d 690, 711 (9th Cir. 2009). So we consider their § 3604(b) claim through the lens of disparate treatment. *See Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016).

Disparate treatment claims under the FHA are often reviewed using the three-stage burden-shifting test derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–04 (1973).  *See also Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997).  The HOA, relying on *McDonnell Douglas*, argues that the Morrises failed to prove a prima facie disparate treatment claim because "[n]o other event that had been held in the neighborhood compared to the Morrises['] Christmas Program."

The *McDonnell Douglas* framework, however, is only one way of establishing a disparate treatment claim, applicable where the evidence is indirect and directed toward challenging as pretextual a facially neutral explanation for the challenged action.  *See, e.g.*, *Lyons v. England*, 307 F.3d 1092, 1112–13 (9th Cir. 2002); *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1361 (9th Cir. 1985).  The Morrises may prevail by otherwise "'produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the defendant and that the defendant's actions adversely affected [them] in some way."  *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)).  Under the FHA, the evidence need not "prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'"  *Ave. 6E Invs.*, 818 F.3d at 504 (quoting *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015)).

We start with whether the Morrises were "adversely affected" by the Board's conduct.  *Pac. Shores Props.*, 730 F.3d at 1158.  The Morrises maintain that they were adversely affected by the Board's discriminatory enforcement of the CC&Rs.  As the Seventh Circuit recognized in *Bloch v. Frischholz*, 587 F.3d 771, 779–81 (7th Cir. 2009) (en banc), discrimination against a member

of a protected class in the interpretation and enforcement of HOA rules can violate § 3604(b) of the FHA.

In *Bloch*, an observant Jewish family sued their condominium association for repeatedly removing the traditional mezuzah from the family's doorpost in the name of enforcing rules that prohibited leaving "objects of any sort" outside residence doors. *Id.* at 773. The en banc court held that "§ 3604(b) prohibits the [Homeowners'] Association from discriminating . . . through its enforcement of the rules, even facially neutral rules." *Id.* at 780. Similarly here, if the Board had selectively enforced the HOA rules against the Morrises on the basis of their religious behavior, the enforcement would likewise fall afoul of § 3604(b).

In this case, however, the HOA's actions regarding the CC&Rs and the Morrises' Christmas event did not constitute "enforcement" of its rules, discriminatory or otherwise. Stripped down, the Morrises' claim rests on: the January 2015 letter advising the Morrises that the Christmas program would most likely violate the CC&Rs, the February 2015 residents' meeting, including the Board's letter to West Hayden Estates residents emphasizing the disruptive nature of the Christmas pageant and encouraging a vote on whether to "allow" the program, and the October 2015 letter.

Viewing this evidence in the light most favorable to the Morrises, *Corbello*, 974 F.3d at 973, the Morrises have not pointed to any adverse action sufficient to support a § 3604(b) disparate treatment claim. The Morrises were not prevented from purchasing or moving into their home. Nor were they prevented from enjoying the privileges of home ownership. They were never prevented from holding their Christmas event. Nor is there any suggestion in the record

that they were denied equal use and enjoyment of West Hayden Estates' common areas, that they incurred any economic losses or onerous administrative burdens, *Pac. Shores Props.*, 730 F.3d at 1165–66, or that they were subjected to any "proceedings that were contrary to the [HOA's] established policy and practice" as a result of the Board's actions, *Harris v. Itzhaki*, 183 F.3d 1043, 1052 (9th Cir. 1999).

The Board's attorney did send a letter to the Morrises in October 2015, stating that the HOA had authorized enforcement of the CC&Rs through legal action if the Morrises proceeded without "written approval from the Association Board to conduct [their] planned event." The Morrises never sought written approval and received none, but the HOA took no action, and the Christmas programs went forward as planned in 2015 and 2016.[2] So, before the commencement of this action, the HOA did not enforce the CC&Rs, by taking legal action or otherwise.[3]

The Morrises' experience is thus fundamentally dissimilar from the adverse actions taken in applying established procedures in cases such as *Bloch*, *Harris* and *Pacific Shores*, each of which had a practical impact on the plaintiff. Unlike in *Bloch*, the Board did not enforce, selectively or otherwise, their facially neutral rules.

---

[2] Judge Collins would hold that the HOA's actions constituted enforcement of the CC&Rs, and that a reasonable jury could find that this enforcement constituted differential treatment. Collins Dissent at 89–90. As we discuss in more depth below, a demand letter outlining the possible CC&R violations of a proposed action, without more, is not adverse action.

[3] The Board now seeks to enjoin any future productions of the Christmas program as a counterclaim to this suit.

In *Harris*, a tenant alleged that, in response to her complaints about discrimination, her landlords immediately sent her eviction notices when they did not receive rent on time, a departure from their "established policy and practice" of calling tenants to ask about rent before initiating the eviction process. 183 F.3d at 1052. After her landlords twice sent her such eviction notices, the tenant was forced to alter her own behavior and "send all subsequent payments by certified mail" to ensure she did not face eviction. *Id.*

In *Pacific Shores*, group homes for recovering alcoholics and drug users challenged a local ordinance that prohibited new group homes from opening in most residential areas and required existing homes to undergo a burdensome permit process to continue operating. 730 F.3d at 1147. Although the group homes did not challenge the city's denial of their individual permit applications, this Court held that they had faced "adverse effects" under the FHA's disability discrimination provision because the ordinance forced them "to submit a detailed application for a special use permit . . . to continue operating," requiring the expenditure of "substantial time, effort, and resources" and leading "to the closure of approximately one third of the City's" existing group homes. *Id.* at 1164–65.

Here, by contrast, the only concrete action the HOA took was to send a letter stating that it had authorized legal action it never took. That was it. The Morrises did nothing in response, the event went on, and the Board took no enforcement action. Unlike in *Bloch* and *Harris*, the Morrises disregarded the HOA's demand letter without facing any consequences or enforcement, and unlike in *Pacific Shores*, they did not change their behavior to avoid enforcement.

We construe the FHA liberally, *see McGary*, 386 F.3d at 1262, and do not mean here to provide a comprehensive standard for determining which adverse actions *could* give rise to a § 3604(b) claim.   But to support a disparate treatment claim, plaintiffs must be able to point to *some* concrete adverse impact suffered as a result of the defendants' behavior.  The Morrises have pointed to no such harm.  We therefore conclude that the jury's verdict for the Morrises' § 3604(b) disparate treatment claim is not supported by sufficient evidence and so affirm the grant of JMOL as to that claim.  *Cf. Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) (reversing the district court's grant of JMOL because substantial evidence supported the jury's verdict).  Because we hold the HOA did not cause any adverse impact on the Morrises, we do not reach the second element of the Morrises' § 3604(b) claim, whether any adverse action was motivated by adversity to religion.

### (2) Section 3617 of the FHA

The Morrises also brought a claim under § 3617 of the Act, which prohibits the "coerc[ion], intimidat[ion], threaten[ing], or interfere[nce] with any person in the exercise or enjoyment of" rights protected by other provisions of the FHA ("interference claim").   42 U.S.C. § 3617.  Section 3617 is frequently construed with reference to § 3604(b), but the two provisions are not coextensive.  *See Bloch*, 587 F.3d at 781–82.   Section 3617 "reach[es] all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *U.S. v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (internal quotation marks omitted) (quoting *Mich. Prot. & Advoc. Serv.* v. *Babin*, 18 F.3d 337, 347 (6th Cir. 1994)).  A Section 3617 violation does not require the person "who is

interfered with to capitulate to the interference," and a violation can "involve a 'situation where no discriminatory housing practice may have occurred at all.'" *Id.* at 836 (quoting *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975)). "For instance, if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." *Bloch*, 587 F.3d at 782.

Given this framework, the jury reasonably concluded that the Board "threatened, intimidated, or interfered with" the Morrises' right to purchase and enjoy their home free from religious discrimination. The JMOL standard requires that the jury's verdict be upheld if there is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). For the § 3617 interference claim, there is.

First, there is evidence that the Board "threatened, intimidated, or interfered" with the Morrises during the purchase and enjoyment of their home. Unlawful interference occurs when a defendant "meddl[es] in or hamper[s] an activity or process" protected by the FHA. *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (citation omitted). In this case, the Board notified the Morrises, in their January 2015 letter, that their planned event was "prohibit[ed]" by the CC&Rs and would "fill [the] neighborhood with . . . hundreds of people and possible

undesirables." The letter also warned that the Board did "not wish to become entwined in any expensive litigation."[4]

The following month, before the Morrises closed on their home, the Board of the HOA organized an "emergency meeting" of West Hayden Estates residents to discuss the potential impact of the Morrises' Christmas program on the community. A letter from the Board to all West Hayden Estates residents described the program as an "extravagant event generating excessive traffic" and noted that the Morrises had "not obtain[ed] the necessary permits" for their 2014 program. The letter went on to state that the Board believed the Christmas program would violate the CC&Rs and that the Board was "fearful that allowing such a breach of the [CC&Rs] in this matter w[ould] ultimately lead to further breaches in other areas within the community." Finally, the letter stated that Jeremy Morris had "threatened legal action if the board d[id] not permit his request" to host the event and warned that the matter "may result in a legal situation that must be addressed and handled immediately." The agenda for the meeting framed the topic for discussion as "possible litigation that may involve additional legal costs and increased assessments," and at the end of the meeting, the HOA members present voted unanimously not to allow the Christmas event, although the event was not in fact banned.

Both the January 2015 letter and the February 2015 meeting could have been construed by the jury as "threatening, intimidating, or interfering" with the Morrises' purchase and enjoyment of their home. The HOA Board's

---

[4] We discuss alleged threats against and harassment of the Morrises by other residents of West Hayden Estates later in this opinion. *See infra* Part II.a.ii.

handling of the February meeting, in particular, resulted in neighborhood opposition to the Morrises, not least by indicating that if the Morrises were to move into the neighborhood, litigation would likely ensue. Likewise, the January 2015 letter could have been understood as threatening the Morrises with litigation should they move into the neighborhood and hold their Christmas program as planned. Finally, the October 2015 letter warning the Morrises that the Board had been authorized to take legal action should the Morrises proceed with their event could have been read as a threat or attempt at intimidation. A reasonable jury could therefore find that the Board "intimidate[d], threaten[ed], or interfere[d] with" the Morrises as they sought to purchase and enjoy the use of their home. 42 U.S.C. § 3617.

Section 3617, however, while broad, is not all-encompassing; neighborly squabbles do not, without more, create an FHA cause of action. To make out a claim under § 3617, a plaintiff must show that the defendant's actions affected the "exercise or enjoyment of . . . any right granted or protected" by provisions of the Act, 42 U.S.C. § 3617, including the right to be free from discrimination based on religion. Heeding both the Supreme Court's admonition to give the FHA a "generous construction," *City of Edmonds*, 514 U.S. at 731, and the obligation under the JMOL standard to respect a jury's verdict unless no reasonable jury could have found a statutory violation, we conclude that the JMOL was improper as to this § 3617 claim.

At its core, the FHA guarantees tenants and homeowners a right to take and enjoy possession of a home free from discrimination based on a protected characteristic, including religion. *See Bloch*, 587 F.3d at 782–83; 24 C.F.R. § 100.400. Given the JMOL standard, *see Krechman*, 723

F.3d at 1109, we must review the record for evidence that the Board's threatening, intimidating, and interfering conduct, although it did not preclude the Morrises from purchasing their home or putting on their Christmas event, was driven at least in part by a motive to disfavor the Morrises' religion. On this question, the Morrises' evidence is sufficient to support a rational jury's verdict.

The Morrises point to three pieces of evidence to support their assertion that the Board was driven by anti-religious animus: two portions of trial testimony and the January 2015 letter.

First, the Morrises point to "[t]he Association's board flatly stat[ing] it did not want the Morrises' 'press[ing]' their beliefs 'on the community.'" The quoted testimony is that of Larry Breazeal, the former owner of the Morrises' home. The passage reads: "[Jennifer Scott] was talking about the [January 2015] letter that they sent out and . . . she was a little bit distraught about the letter, because the final sentence in the letter stated something about not wanting their Christmas program and the beliefs associated with it pressed on the community because there [were] nonbelievers in the community." In context, the testimony about Scott's statement concerning the Morrises "press[ing]" their beliefs "on the community" is a report of her paraphrase, as recalled by Breazeal, of the January 2015 letter. It is therefore largely cumulative of that letter, which we shall discuss.

Second, the Morrises point to a recorded statement by Ron Taylor, Jennifer Scott's successor as president of the HOA Board, that "someone in this association doesn't like Christmas." In the recording, which captures a wide-ranging and at times combative discussion, Jeremy Morris can be heard asking "Why did [the Board] come after me?" to

which Taylor responds: "It's because somebody in this association doesn't like Christmas."

Aside from the trial testimony and the recording, the Morrises focus on the January 2015 letter as evidence of discriminatory intent on the part of the HOA Board. Recall that the version of the letter sent to the Morrises in response to their pre-purchase inquiry about hosting the Christmas program at West Hayden Estates included the following two paragraphs:

> And finally, I am somewhat hesitant in bringing up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up.

> It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in any expensive litigation to enforce long standing rules and regulations and fill our neighborhood with the hundreds of people and possible undesirables.

Again, plaintiffs in an FHA action need not "prove that the discriminatory purpose was the *sole* purpose of the challenged action"; they need only demonstrate that such a purpose "was a 'motivating factor.'" *Ave. 6E Invs.*, 818 F.3d at 504 (emphasis added) (quoting *Arce*, 793 F.3d at 977). Our present inquiry, then, is whether the January 2015 letter, viewed alongside other evidence in the record, could serve as evidence that the Board was *actually motivated*, at least in part, by an anti-religious discriminatory purpose. *Pac.*

*Shores Props.*, 730 F.3d at 1158; *Ave. 6E Invs.*, 818 F.3d at 504.**5**

Principally, then, the Morrises' discrimination claim relies on Ron Taylor's statement that "somebody in th[e] association doesn't like Christmas," and the sentence in the final 2015 letter: "And finally, I am somewhat hesitant in bring[ing] up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up."

Viewing this evidence in the light most favorable to the Morrises, *Corbello*, 974 F.3d at 973, there is sufficient "evidence adequate to support the jury's conclusion" that the Board violated § 3617, *Johnson*, 251 F.3d at 1227. To be sure, there is also sufficient evidence to have permitted the jury to draw the conclusion—endorsed by the district court's JMOL decision and Judge Tashima's dissenting opinion—

---

[5] The draft letter, revised before the January 2015 letter was sent, read:

> And finally, I am somewhat hesitant in bring[ing] up the fact that some of our residents are avowed atheists and I don't even want to think of the problems that could bring up.

> It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in any expensive litigation to enforce long standing rules and regulations and fill our neighborhood with the riff-raff you seemed to attract over by WalMart.. Grouse Meadows indeed!!! We don't allow "those kind" in our neighborhood.

Our focus is on the letter actually sent. The draft letter is pertinent only for whatever light it throws on what the jury could have concluded regarding the motives behind the letter sent.

that the Board's conduct was motivated only by concern about potential disruption and a desire to maintain harmony in the West Hayden Estates neighborhood.  Tashima Dissent at 56–60, citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) and *Ave 6E Invs.*, 818 F.3d 493).  But again, in "assessing the propriety" of a grant of JMOL, we are constrained to "protect[] the province of the jury" by refraining from "weigh[ing] evidence," which necessarily precludes us from determining which of the plausible conclusions to which a jury could arrive is best supported by the evidence.  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).  We may look only to whether there was "evidence adequate to support the jury's" actual conclusion. *Johnson*, 251 F.3d at 1227.**[6]**

There was such evidence.  The Board's letter to the Morrises could reasonably be read to indicate that the program's association with the Christian faith was one

---

[6] *Avenue 6E* and *Arlington Heights* do not alter this standard of review.  Judge Tashima's partial dissent is correct, Tashima Dissent at 56–58, that courts deciding whether a discriminatory purpose was a motivating factor must consider the broad context of a defendant's actions, including "events leading up to the challenged decision . . . the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact." *Ave. 6E Invs.*, 818 F.3d at 504.  *Arlington Heights* similarly states that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  429 U.S. at 266.  *Avenue 6E* and *Arlington Heights* thus make clear the broad scope of evidence relevant to a discriminatory purpose inquiry that may be presented to the jury.  They do not alter the constraints on a court reviewing the propriety of a grant of JMOL based on that evidence.  We are not permitted to determine the most reasonable conclusion to which a trier of fact could arrive, or, otherwise stated, to weigh evidence—that is the province of the jury in the first instance. *Harper*, 533 F.3d at 1021.

consideration in the Board's opposition to the show. In addition, in his recorded argument with Jeremy Morris, Ron Taylor stated that "somebody in this association . . . not lik[ing] Christmas" was one reason why the Board continued to oppose the Morrises' Christmas program. These statements sufficiently support an inference by the jury that an anti-Christian purpose was at least *a* motivating factor in the Board's conduct regarding the proposed Christmas event, independent of any other concerns also underlying that conduct. And given this permissible inference, there was sufficient evidence for the jury rationally to conclude that the Board interfered with the Morrises' exercise of their right to purchase and enjoy their home at least in part because of their religious expression, and therefore violated § 3617 of the FHA.

As we are constrained to "protect[] the province of the jury" by looking only to whether there is "evidence adequate to support the jury's conclusion," even where, as here, other conclusions would have enjoyed sufficient support in the record, *Harper*, 533 F.3d at 1021, we reverse the grant of JMOL as to the Morrises' § 3617 claim.

## ii.    Harassment by West Hayden Estates Residents

The Morrises contend additionally that the HOA's toleration of threats and harassment targeted at the Morrises by other residents of West Hayden Estates violated § 3604(b) of the FHA. We agree that in appropriate circumstances, § 3604(b) does forbid pervasive harassment linked to a protected category, here, religion. But the record does not support the conclusion that the HOA may be held responsible for the harassment of the Morrises that occurred.

In considering this harassment claim, we first clarify the scope of the FHA's anti-discrimination provisions.  In *CCCI v. City of Modesto*, we held that the FHA's protections extend to a tenant or homeowner's "continuing rights, such as the privilege of quiet enjoyment of the dwelling." 583 F.3d at 713.    Liability under the FHA's anti-discrimination provisions can therefore attach to conduct that occurs both before and after the sale or rental of a home, including "a whole host of situations . . . not amounting to constructive eviction."  *Id.* at 714; *see Harris*, 183 F.3d at 1054.

Other federal courts of appeals have recognized that the FHA's prohibition on post-acquisition discrimination encompasses a prohibition against "discriminatory harassment that unreasonably interferes with the use and enjoyment of a home—by another name, a hostile housing environment."  *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 861 (7th Cir. 2018)).   *See also Neudecker v. Boisclair Corp.*, 351 F.3d 361, 364–65 (8th Cir. 2003); *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993).  We now join these circuits and hold that § 3604(b) of the FHA prohibits the creation of a hostile housing environment based on "race, color, religion, sex, familial status, or national origin."  *See Wetzel*, 901 F.3d at 861.

The anti-discrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, have long been understood to provide a cause of action for claims arising out of a hostile work environment.  *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998); *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (as amended).  Although the hostile environment theory of discrimination was first discussed in the context of

sexual harassment, *see Meritor Sav. Bank*, 477 U.S. at 73, it has since been applied to claims of discrimination on the basis of protected characteristics other than sex, *see Dawson v. Entek Int'l*, 630 F.3d 928, 939 (9th Cir. 2011) (sexual orientation); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (as amended) (race); *see also, e.g.*, *Huri v. Off. of the Chief Judge of the Circuit Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015) (religion and national origin).

"We apply Title VII discrimination analysis in examining Fair Housing Act . . . discrimination claims." *Gamble*, 104 F.3d at 304.  Because we recognize that the anti-discrimination provision of Title VII—under which it is unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1)—prohibits the creation of a hostile work environment, it follows that the parallel language of the FHA, which prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. §3604(b), likewise prohibits discriminatory harassment that creates a hostile environment.  *See Wetzel*, 901 F.3d at 863.  Adapting the Title VII framework to the Fair Housing context, a plaintiff may establish that he suffered a hostile housing environment by showing that he was subjected to (1) severe or pervasive harassment (2) that was based on a protected characteristic, here religion, and (3) that the defendant is responsible for the resulting hostile housing environment.  *See Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020); *see also Wetzel*, 901 F.3d at 861–62.  In this case, the third prong—

the question of derivative liability for harassment—forecloses the Morrises' harassment claim.

According to the Morrises, the HOA bears some responsibility for harassing behavior perpetrated by Larry Bird and other West Hayden Estates residents.[7] In support of this argument, the Morrises rely on an out-of-circuit case, *Wetzel*, which held that a landlord who has "actual notice of tenant-on-tenant harassment based on a protected status," is liable under the FHA where the landlord "chooses not to take any reasonable steps within its control to stop that harassment." *Wetzel*, 901 F.3d at 859. *Wetzel* involved St. Andrews, a "residential community for older adults." *Id.* The *Wetzel* opinion made clear that St. Andrews's potential liability for tenant-on-tenant harassment—harassment that went "far beyond mere rudeness, all the way to direct physical violence," *id.* at 866—hinged on whether the

---

[7] The harassment evidence was excluded by the district court on the ground that the HOA was not liable for actions taken by residents who were not "(1) members of the board, (2) agents of the HOA, [or] (3) employees of the HOA;" the jury was directed to disregard the evidence. *See infra*, p. 43, n. 12. The evidence included testimony concerning a number of incidents involving the Morrises' neighbors, some of it contested. For example, Kristy Morris testified at trial that, during the Morrises' 2015 Christmas show, Bird accosted Jeremy Morris in the Morrises' driveway and threatened that he and other West Hayden Estates residents had "enough guns and ammunition that will take care of you." One of the Morrises' volunteers testified that, during the 2016 program, a West Hayden Estates neighbor screamed obscenities at her and told her she "was not welcome in the neighborhood." And a visitor to the 2016 program testified that one of the Morrises' neighbors kicked the side of her car and demanded to know "why are you in my neighborhood?"

landlord "had, but failed to deploy, available remedial tools" against harassing residents. *Id.* at 865.[8]

The power to address discriminatory conduct against a resident by a third party "depends upon the extent of the [defendant's] control or any other legal responsibility the [defendant] may have with respect to the conduct of" that third-party. 24 C.F.R. § 100.7(a)(iii). The Morrises were homeowners. The West Hayden Estates HOA—unlike the defendant in *Wetzel*—is not a landlord. Unlike a landlord, the HOA cannot threaten or carry out eviction or expulsion of harassing residents, who are also homeowners. *Cf. Wetzel*, 901 F.3d at 865–66.

The Board *does* have the power, via the CC&Rs, to enforce HOA rules against association members. That power includes the enforcement of the CC&Rs via the remedies outlined in the rules themselves. The Morrises argue that the HOA's power to seek to enjoin breaches of the CC&Rs by filing a lawsuit demonstrates that the Board is liable for harassing conduct by West Hayden Estates residents. But to support the assertion that the HOA has the power to address neighbor-on-neighbor harassment, the Morrises point only to the fact that the HOA once "sent a letter to one homeowner whose dog had bitten a child

---

[8] The Morrises also cite a Second Circuit case, *Francis v. Kings Park Manor, Inc.*, 944 F.3d 370 (2d Cir. 2019), *vacated*, 992 F.3d 67 (2d Cir. 2021) (en banc). The opinion the Morrises rely upon was vacated by the en banc Second Circuit, which held that although some landlords may exercise control over co-tenants sufficient to confer FHA liability for tenant-on-tenant harassment, this degree of control cannot be presumed to exist in the landlord-tenant relationship under New York law. *Francis*, 992 F.3d at 77–80.

requiring that owner to fence their animal—and the owner complied."

This incident demonstrates the HOA's power to enforce rules *enumerated in the CC&Rs*. Those rules specifically require that dogs "shall be contained when on" an owner's lot and which reserve to the Board the power to "require removal of any pet which it finds disturbing other owners unreasonably." The Morrises do not point to any CC&R provision violated by Bird's or other neighbors' behavior toward the Morrises, or toward volunteers at or visitors to the Morrises' Christmas event, or any CC&R remedy that the Board could have deployed against them for what they did.

Liability for third-party conduct under the FHA is fact-dependent. We do not hold that an HOA can *never* bear responsibility for discriminatory harassment inflicted by one member on another. In this case, however, the Morrises' arguments are devoid of any demonstration that the "remedial tools" available to the Board extended to the power to intervene in disputes between neighbors. *Wetzel*, 901 F.3d at 865.

On the facts of this case, the HOA was not liable for the allegedly harassing conduct of West Hayden Estates residents. We therefore need not resolve whether the alleged harassment by Bird and others was "severe or pervasive" or whether it was based on a protected characteristic. *Umpqua Bank*, 984 F.3d at 809.

### iii.    The January 2015 Letter

In addition to their § 3604(b) and § 3617 claims, the Morrises challenge the HOA Board's January 2015 letter under § 3604(c) of the FHA. That section prohibits any

party engaged in the sale or rental of a dwelling from "mak[ing], print[ing], or publish[ing] . . . any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on" a protected characteristic, including religion. 42 U.S.C. § 3604(c); 24 C.F.R. 100.75(b).

Once again, we first clarify the appropriate standard for determining whether a statement violates § 3604(c) of the Fair Housing Act. We now follow every other federal court of appeals to consider the question and adopt an objective "ordinary reader" standard. *See Jancik v. Dep't of Hous. & Urb. Dev.*, 44 F.3d 553, 556 (7th Cir. 1995) (collecting cases from the Second, Fourth, and Sixth Circuits); *see also Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 29 (D.C. Cir. 1990) (applying a "reasonable reader" standard). Under this standard, a plaintiff need not present evidence that the defendant harbored a discriminatory purpose. Rather, a statement violates § 3604(c) if "an ordinary listener would believe that [it] suggests a preference, limitation, or discrimination based on a protected status." *Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013) (citing *White v. U.S. Dep't of Hous. & Urb. Dev.*, 475 F.3d 898, 905–906 (7th Cir. 2007)). Put simply, the "touchstone" of a § 3604(c) claim "is . . . the message." *Ragin v. N.Y. Times Co.* (*Ragin I* ), 923 F.2d 995, 1000 (2d Cir. 1991).

An objective, ordinary-reader-focused standard for communications regarding the sale or rental of a dwelling best assures that prospective buyers or renters will not be discouraged by discriminatory advertisements or other communications from seeking homes offered for sale or rental. Under this objective standard, evidence of a speaker

or creator's intent may be relevant insofar as it illuminates the likely understanding of the message by viewers.  But the scope of § 3604(c) liability is defined by the statement's impact on the reader, viewer, or listener, not by the subjective motivations of the speaker.  *See id.*  Nor is the speaker's stated intent dispositive.  Accepting a speaker's disclaimer that he or she "means no offense" as proof of intent would allow the publisher of a discriminatory statement to escape liability no matter the statement's impact on ordinary readers.  *See id.*

Following the FHA's "broad and inclusive 'compass,'" *City of Edmonds*, 514 U.S. at 731 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)), statements need not "jump out at the reader with their offending message" to violate § 3604(c), *Jancik*, 44 F.3d at 556.  Most discriminatory messages are far "more subtle than the hypothetical swastika or burning cross." *Ragin I*, 923 F.2d at 999.  For § 3604(c) to have force, its prohibition must extend beyond facially discriminatory messages to "expression[s] of a tacit preference not to provide housing to members of protected groups." *Soules v. U.S. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817, 824–25 (2d Cir. 1992). Discriminatory "comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group, but in reality be intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group." *McGinest*, 360 F.3d at 1116; *see also Ragin I*, 923 F.2d at 999–1000; *Jancik*, 44 F.3d at 556.

At the same time, the ordinary reader "is neither the most suspicious nor the most insensitive of our citizenry," *Ragin I*, 923 F.2d at 1002.  Merely mentioning one of the protected characteristics identified in § 3604(c), without more, does

not necessarily convey a "preference, limitation, or discrimination" forbidden by the FHA, particularly if "there are situations in which it is legitimate" to do so. *Soules*, 967 F.2d at 824. The notice or statement at issue must be read "in light of all the circumstances" to determine whether an ordinary reader under those circumstances would understand the statement to indicate a forbidden preference or limitation. *Id.*

*Soules*, for instance, explained that a statement inquiring "about the number of individuals interested in occupying an apartment and their ages" did not indicate to the ordinary reader a forbidden preference or limitation based on familial status. *Id.*; *see* 42 U.S.C. §§ 3602 (defining familial status), 3604(a). "Local zoning regulations" could "constitute a valid reason for asking whether and how many children a prospective tenant has," and "[c]onditions in the neighborhood known to be either ideally suited to or inherently dangerous to occupancy by families with children might well permit an inquiry about the ages of the family members." *Soules*, 967 F.2d at 824. In light of these considerations, *Soules* held, the questions asked would not convey to the ordinary reader the proscribed discriminatory preference or limitation based on familial status.

Turning to the facts of this case: First, the parties assume the HOA's January 2015 letter is a statement subject to § 3604(c). The HOA does not argue otherwise. And although a "stray remark . . . unrelated to the decisional process" is insufficient to establish a § 3604(c) violation, *Harris*, 183 F.3d at 1055 (internal quotation marks omitted), the Board's mention of the Morrises' faith was neither "stray" nor unrelated to the Board's treatment of the Morrises. The statement was explicitly presented as a reason for opposing the Christmas program, in an official

communication that went through at least one round of drafting and revision.

In their Complaint, the Morrises asserted: "The HOA printed a statement in the form of a certified letter which indicated a preference for non-religious homeowners." The jury instructions and verdict form followed this same format.

If properly raised on appeal, a statutory theory different from the one underlying the jury instruction can be the basis for "reviewing a motion for judgment as a matter of law," as then "we apply the law as it should be, rather than the law as it was read to the jury." *Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) (citation omitted). But the Morrises do not challenge "the sufficiency of the evidence on a legal basis different from that contained in the instructions." *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 182 (9th Cir. 1989). Instead, the Morrises' argument before us is limited to whether the evidence is sufficient to support the jury's actual finding.[9]

The jury determined, in its special verdict form, that the HOA's January 2015 letter "expressed, in the mind of an ordinary reader, a preference that a non-religious individual purchase Mr. and Mrs. Morris' home." We agree with the district court that the HOA was entitled to JMOL on this claim.

Construing the evidence in the light most favorable to the Morrises, there was "no legally sufficient evidentiary basis for a reasonable jury to find" that the January 2015 letter indicated a preference that a non-religious individual purchase the Morrises' home. *Sanghvi v. City of Claremont*,

---

[9] Whether the Morrises may have succeeded on appeal on a different theory of the meaning of § 3604(c) is therefore not at issue.

328 F.3d 532, 536 (9th Cir. 2003) (quoting Fed. R. Civ. P. 50(a)). The HOA's January 2015 letter to the Morrises expressed concern about the Morrises' proposed Christmas program, in part because of "the fact that some of our residents are non-Christians or of another faith" and suggested that, for that reason, the Christmas program "could bring up" "problems" in the neighborhood. Our question is how an ordinary reader would have interpreted the letter "in light of all the circumstances." *Soules*, 967 F.2d at 824.

The majority of the panel has held with regard to the § 3617 claim that the record evidence, particularly the January 2015 letter, was sufficient to allow the jury to infer that the Board's disapproval and discouragement of the Morrises' Christmas pageant was at least in part motivated by the program's association with the Christian faith. *See* Part II.a.i.2, *supra*. At the same time, considering the Board's January 2015 letter as a whole, a reasonable jury could not have concluded that the letter indicated "a preference that a non-religious individual purchase" the Morrises' home.

The Board's letter was not concerned with the Morrises' personal religiosity. Instead, the letter was concerned only with discouraging the proposed holiday program, even if—as a majority of the panel has concluded—the evidence supports the conclusion that the opposition to the event was in part because it was associated with the Christian faith. Viewing the letter as a whole, an ordinary reader would understand the Board to have indicated a preference, limitation, or discrimination based not on whether the prospective homeowners were themselves religious or non-religious, Christian or atheist, but on whether the event they proposed to host once a year would disturb the neighbors,

both by its size and raucousness and by offending non-Christians.  Although a majority of the panel has concluded that the latter motive offends § 3617, that determination does not indicate that the HOA cared at all about whether the Morrises or other residents were personally religious, including whether they practiced Christianity.

Nor does the letter through its use of the word "undesirables," *see supra* at 22–23, or otherwise, plausibly disparage Christians generally.  Rather, the concern expressed regarding "undesirables" was that "hundreds" of non-resident visitors driving through the neighborhood might include unruly individuals who would interfere with residents' "quiet enjoyment" of their property.  The event itself was largely secular—there's nothing religious about Clifford the Big Red Dog or hot chocolate elves—so the attendees were as likely to come for the spectacle and libations as for religious observation.  No ordinary reader of the January 15 letter would conclude that the "undesirables" referred to were religious—or Christian—individuals.

Moreover, contrary to showing a preference for a non-religious purchaser as the jury concluded, the letter several times expressed appreciation and respect for religious exercise, the Morrises' religion included.  Although the letter expressed concern about the "magnitude" of Morrises' "holiday festival," it also emphasized that "[t]ypical holiday lighting has always been allowed" in West Hayden Estates.

In light of these statements, the letter's sentence about the impact of the Morrises' program on residents who "are non-Christians or of another faith," would not be read by an ordinary reader as a preference concerning prospective homebuyers' personal religiosity.  Nor could an ordinary reader, viewing the Board's January 2015 letter as a whole,

come to the jury's conclusion that the letter expressed "a preference that a non-religious individual purchase Mr. and Mrs. Morris' home." We therefore hold that the district court did not err by granting JMOL to the HOA on the Morrises' § 3604(c) claim.**[10]**

### b. New Trial

Because we reverse in part the district court's grant of JMOL, we next consider the court's alternative grant of a new trial.

A district judge may set aside a jury's verdict if, "weigh[ing] the evidence as he saw it," he concludes that the verdict, "even though supported by substantial evidence . . . is contrary to the clear weight of the evidence, or is based upon evidence which is false," or that a new trial is necessary "to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957). On a Rule 59 motion for a new trial, unlike on a JMOL motion, the trial

---

[10] In Judge Berzon's view, this conclusion is consistent with this opinion's holding that sufficient evidence in the record supported the jury's verdict as to the Morrises' § 3617 claim. To establish discrimination under § 3617, the Morrises needed only to show that discriminatory purpose was a "motivating factor" for the HOA's specific actions with regard to the planned Christmas program. *Ave. 6E Invs.*, 818 F.3d at 504 (quoting *Arce*, 793 F.3d at 977). The jury's special verdict on the § 3604(c) claim—that the HOA's January 2015 letter "expressed, in the mind of an ordinary reader, a preference that a non-religious individual purchase" a home in the subdivision—found a blanket non-religious preference as to the ownership of the home, without regard to the nature of any particular event. That the HOA Board had a religion-based motive for opposing the *event* does not demonstrate that the letter communicated to an ordinary reader an anti-religious preference regarding purchasers in general or the Morrises' in particular, which is the preference the jury identified.

court may weigh the evidence and assess the credibility of witnesses and is not required to view the evidence in the light most favorable to the verdict. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014) (as amended).

The grant of a new trial is reviewed for abuse of discretion, so we may reverse only if the district court's conclusion is "illogical, implausible, or without support in the inferences that may be drawn from the record." *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010). With these principles in mind, we affirm the district court's decision to grant a new trial as to the Morrises' § 3617 claim.

First, the district court believed that granting a new trial was necessary "to prevent . . . a miscarriage of justice." *Moist Cold Refrigerator Co.*, 249 F.2d at 256. The district court concluded after trial that the HOA was unfairly prejudiced by the admission of a great deal of evidence—ultimately stricken—of threats and harassment against the Morrises by other homeowners in West Hayden Estates.[11] Specifically, the jury heard testimony from seven witnesses, all of whom testified that they observed threatening or confrontational behavior from other residents of West Hayden Estates. Both Kristy and Jeremy Morris also testified about an asserted "death threat" they received from one neighbor, Larry Bird. That asserted death threat was

---

[11] The district court did not specifically identify these evidentiary issues in the portion of the order analyzing whether to grant a new trial. But the district court spent several pages explaining why the HOA was unfairly prejudiced by the testimony regarding threats to the Morrises, and earlier in the order stated that a "new trial may also be granted if the Court concludes that a party was prejudiced by erroneous evidentiary decisions." *See Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

described—but not itself captured—in a recording of a conversation between Jeremy Morris and Ron Taylor, in which Jeremy Morris characterized Bird as "threatening to murder my family."

The district court eventually determined that this evidence should be stricken and instructed the jury to disregard it.[12] The jury, however, heard a lot of such testimony from several witnesses. The jury was also shown exhibits regarding alleged threats by non-Board-members against the Morrises and visitors to their Christmas program. For that reason, the district court concluded, it was "exceedingly unlikely that the jury was actually able to set aside" all of that evidence. The court also determined that the prejudice suffered by the HOA "was compounded by the fact that Plaintiffs' characterization of Mr. Bird's statements as a 'death threat' is an embellishment."[13]

Although, as the district court acknowledged, a court must ordinarily presume that the jury will follow the court's instructions, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000), the district court here did not abuse its discretion by determining that the admission of the disturbing harassment evidence might have unfairly prejudiced the jury against the

---

[12] As discussed, *supra* at Part II.a.ii, we agree with the district court's conclusion that the West Hayden Estates HOA is not liable for alleged harassment by the Morisses' neighbors. Because the HOA was not liable for this harassment, it was not an abuse of discretion for the district court to regard evidence relating to the alleged harassment as improperly admitted and to be extraneous to the surviving claims.

[13] As mentioned earlier, *see supra* note 7, Kristy Morris testified that Larry Bird told Jeremy Morris "we have enough guns and ammunition that will take care of you." A partial video of the incident does not capture this statement; it contains only the Morrises' assertion that Larry Bird said he would "take care of" Jeremy Morris.

HOA.  A critical component of the Morrises' § 3617 claim was that the HOA had a discriminatory motive in opposing the Christmas program, whereas the HOA argued at trial that its actions were motivated by a desire to avoid the disruption to the neighborhood that would occur with an event of the Christmas program's scale.  It was not illogical for the district court to conclude that the many witnesses and exhibits suggesting that individual West Hayden Estates residents harassed and harbored animus toward the Morrises might have colored the jury's assessment of the HOA Board's motive.

The district court also based its grant of a new trial on its determination that the verdict was against the weight of the evidence because the Morrises' principal witness—Jeremy Morris—was not credible and the HOA's witnesses, including Jennifer Scott, were "convincing and credible." The district court determined that Jeremy Morris's testimony was inconsistent with video, photographic, and documentary evidence and that his account of the HOA Board as the aggressor in the conflict over the Christmas program was inconsistent with record evidence that he was "aggressively confrontational" and "routinely threatened them with litigation."  By contrast, the district court found the testimony of the HOA's witnesses, including Jennifer Scott, president of the Board at the time the January 2015 letter was drafted, credible and consistent.

After reviewing the record carefully, we cannot say that the district court's determination was "illogical, implausible, or without support in the inferences that may be drawn from the record."  *Kode*, 596 F.3d at 612.  As Judge Tashima's partial dissent explains, the Morrises' discrimination claim was neither robust nor unassailable.  *See* Tashima Dissent at 52–55.  Contrasting conclusions could be drawn from the

few pieces of evidence in the record that support the jury's verdict on the § 3617 claim.  Moreover, as the district judge noted, Jeremy Morris's testimony was inconsistent with documentary evidence in the trial record.   In particular, Morris often downplayed the scale of his Christmas program in his testimony.  He testified, for instance, that he left his roughly 200,000 Christmas lights on past 8:00 PM only one year, on Christmas Eve and Christmas Day, but as the HOA's counsel pointed out on cross-examination, Morris advertised on his Facebook page that he would leave his lights on until 10:00 PM from December 23 to Christmas Day in 2016.[14]  The record also contains multiple recordings of Jeremy Morris initiating altercations with his neighbors and thus supports the district court's determination that Morris was "aggressively confrontational," a conclusion that could cast doubt on his credibility.

In contrast to Jeremy Morris's testimony, the district court found Jennifer Scott's testimony consistent and credible.  The thrust of Scott's testimony was that the HOA Board was not motivated by opposition to Morris's religion but rather was "really concerned about some of the CC&R violations."  She and another Board member, Pat Keilig, also testified that the Board was "mostly" concerned about "the traffic" and attendant safety risks "that the light show would cause," consistent with the Board's January 2015 letter.  And

---

[14] The trial record shows other inconsistencies as well.  For example, Morris testified that he did not want traffic at the event, but in his 2016 Facebook post, he encouraged visitors to "come directly to see" his Christmas lights in their cars.  Both Jeremy and Kristy Morris initially testified that Jeremy Morris never used a bullhorn at the West Hayden Christmas events, but Jeremy Morris's testimony later admitted bullhorn use after further questioning and the presentation of contrary video evidence.

with respect to the one sentence in the Board's January 2015 letter that referenced religion, both Scott and another Board member, Ron Taylor, testified the full Board never approved that language and that they would not have approved sending the letter with that language in it.**[15]**

So, on the one hand, Jeremy Morris's testimony depicted the Christmas program as less disruptive than the documentary evidence demonstrated and painted the HOA as arbitrarily enforcing the CC&Rs against him. The district court had a basis in the record to conclude that that testimony was not credible. On the other hand, the testimony of Jennifer Scott and the HOA's other witnesses, the district court believed, was credible. That testimony supported the conclusion that the Board did not have a discriminatory motive for opposing the Christmas program. A determination of discriminatory intent must turn, at least in part, on the factfinder's assessment of the relevant party's subjective motivations, and it is the province of the trial court to make credibility determinations in the context of a new trial motion. *See Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1182 (9th Cir. 2017); *Kode*, 596 F.3d at 612. The district court therefore did not abuse its discretion in determining that the jury's verdict for the Morrises was "contrary to the clear weight of the evidence,

---

[15] Keilig testified that she sent the letter to the Morrises in a rush to give them an answer about the Christmas event's status under the CC&Rs and that, when she mailed the letter, she "didn't realize it wasn't really signed off" by "the board."

or . . . based upon evidence which is false." *Moist Cold Refrigerator Co.*, 249 F.2d at 256.[16]

The district court's grant of a new trial was within its discretion.[17]

---

[16] Our dissenting colleague as to this issue, Judge Collins, disagrees, stating that "a simplistic wholesale rejection of *all* of one side's witnesses and evidence based on little more than a wholesale rejection of *one* of that side's witnesses . . . is a clear abuse of discretion." Collins Dissent at 99. The district court's decision concerning the additional witnesses is not determinative here, given that there was no abuse of discretion concerning its credibility determination of the principal witnesses, Jeremy Morris and Jennifer Scott, and our holding that the HOA is not liable for the actions of the neighbors.

We note as well that Judge Collins highlights testimony that tends to show the minimal impact of the Morrises' actual 2015 and 2016 holiday events, Collins Dissent at 76–79, but there is testimony supporting the opposite conclusion. The actual impact of the Christmas events is not particularly relevant to the Morrises' various FHA claims, as those claims concern the HOA Board's actions before the events were held at West Hayden Estates. But the differences in the accounts of what actually happened during the 2015 and 2016 events could be pertinent to the credibility of the witnesses. So, to place Judge Collins' account in context: Witnesses did explain that there were "lots of lights;" and that they were "bright;"**,** and one person testified that she was drawn to the Morrises display because "when you go around town looking for Christmas lights, you go for the ones that have the most." An attendee, familiar with the neighborhood, testified that she noticed an increase in cars parked on the street and that, with the buses bringing people in and out of the neighborhood there was "a lot of coming and going" and "more [traffic] than what would be usual." That attendee, also a volunteer at the event, testified that she saw "hundreds" of people each night "at any single time." Several of the witnesses mentioned the presence of Dolly the camel in the Morrises' front yard, and, one year, a miniature donkey. The police were called on several occasions.

[17] Because we affirm the grant of a new trial, we do not reach the question whether, in the alternative, remittitur was appropriate.

### c.  Injunction

Finally, we address the district court's grant of injunctive relief to the HOA.

After granting the HOA's JMOL motion on all of the Morrises' claims, the district court issued an injunction preventing the Morrises "from hosting a Christmas program in the West Hayden Estates that violates the CC&Rs in the manner described in" the district court's post-trial order. Specifically, the district court concluded that the Morrises' Christmas programs violated, among other provisions, the sections of the CC&Rs prohibiting "decorat[ing] the exterior of any building . . . visible from a neighboring lot," using a dwelling "for any purpose other than a single-family residential purpose," and using a dwelling in a way "which would in any way interfere with the quiet enjoyment of" other residents.

The district court's decision to enjoin the Morrises' Christmas program was premised on its conclusions that the HOA was entitled to JMOL on all of the Morrises' claims and that no reasonable jury could conclude that the HOA's attempts to stop the Morrises' Christmas program were motivated in part by religious animus.  As explained above, we agree with the Seventh Circuit's decision in *Bloch* that discriminatory enforcement of HOA rules, even facially neutral rules, can violate the FHA.  *Bloch*, 587 F.3d at 783–86.  Although the HOA never actually sought judicial enforcement of the CC&Rs against the Morrises in this case, the HOA's counterclaim against the Morrises would seek to do exactly that.

Because a majority of the panel has determined that the HOA is entitled to a new trial on the Morrises' § 3617 claim, during which a jury will have a new opportunity to determine

whether the HOA's conduct toward the Morrises was motivated at least in part by an intent to discriminate against them based on religion, we vacate the district court's grant of an injunction to the HOA. Whether the HOA may enforce the CC&Rs against the Morrises consistent with the FHA will depend on whether the jury after retrial concludes that the HOA was motivated in part by a discriminatory purpose in its interactions with the Morrises. If the jury so concludes, and if that decision is supported by sufficient evidence, then simultaneously permitting an injunction against the Morrises could have the effect of sanctioning discriminatory reliance on the CC&Rs. The injunction, therefore, is vacated.

## III. Conclusion

A majority of the panel holds that:

The district court properly granted JMOL to the West Hayden Estates HOA as to the Morrises' claims of intentional discrimination under §§ 3604(b) and 3604(c) of the FHA. But a reasonable jury could find that the Board interfered with the Morrises' right to purchase and enjoy their home free from discrimination, so the grant of JMOL as to the § 3617 claim is reversed. The district judge did not abuse his discretion in holding that the jury's verdict was against the clear weight of evidence; we therefore affirm the grant of a new trial as to the Morrises' § 3617 claim and remand. Finally, we vacate the grant of an injunction against future productions of the Christmas program, which the district court may reconsider following retrial of the Morrises' remaining FHA claim.

In so holding, we are mindful of the FHA's "'broad and inclusive' compass" and "the Act's stated policy 'to provide, within constitutional limitations, for fair housing throughout the United States.'" *City of Edmonds*, 514 U.S. at 731 (first

quoting *Trafficante*, 409 U.S. at 209 and then quoting 42 U.S.C. § 3601). Accordingly, although the discrimination alleged by the Morrises may have been subtle, we cannot "trivialize" the FHA "by construing it to outlaw only the most provocative and offensive expressions" of bias. *Ragin I*, 923 F.2d at 999.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

---

TASHIMA, Circuit Judge, dissenting in part:

I believe that the district court properly granted the motion of the West Hayden Estates First Addition Homeowners Association (the HOA) for judgment as a matter of law (JMOL) on all the Morrises' claims because the evidence permits only one reasonable conclusion: the HOA was concerned about the Morrises' holiday events because of the size and scale of the events, not because of the Morrises' religion. *See Morris v. W. Hayden Ests. First Addition Homeowners Ass'n*, 382 F. Supp. 3d 1093, 1105 (D. Idaho 2019); *see also Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017) (stating that "[j]udgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion" (quoting *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008))). The HOA consistently expressed concern about the effect the events would have on the residential neighborhood: hundreds of people arriving every night for multiple nights, cars and buses clogging the streets, choirs singing and music playing outside the house through speakers, excessive lights, a camel, and other animals in the front yard. The primary evidence the Morrises proffered to support their claim was

the January 2015 letter sent by the board, which the district court aptly characterized as "the crux of Plaintiffs' case." *Morris*, 382 F. Supp. 3d at 1099. The Morrises relied, and continue to rely, on both the initial draft of the letter and the letter that ultimately was sent to the Morrises.[1] As the district court reasoned, the letter indicated the HOA Board's intention to be sensitive to religious differences, not a religious preference. *Id.* at 1100-01. The evidence unequivocally shows that the HOA did not oppose the Morrises' Christmas programs because of religion but because of problems created by the crowds, noise, and traffic generated by the events. Thus, there is no evidence to support the jury's findings that the HOA intentionally discriminated against the Morrises based on their religion during and after the purchase of their home in violation of 42 U.S.C. § 3604(b), that the HOA's letter expressed a preference that a non-religious person purchase the home in violation of § 3604(c), or that the HOA interfered with the Morrises' purchase or enjoyment of their home in violation of § 3617.

Because the evidence is so one-sided, the district court also properly granted the HOA's motion for injunctive relief and did not abuse its discretion in alternatively finding that the HOA is entitled to a new trial and to remittitur. In all of its rulings, the district court carefully and thoroughly

---

[1] The majority claims that it relies on the draft of the letter "only for whatever light it throws on what the jury could have concluded regarding the motives behind the letter sent." Maj. op. at 27 n.5. However, as the district court explained, the draft letter was prepared by Larry Strayer, a former board member, and was sent without board approval. The letter thus "has little if any relevance to the *Board*'s actual intent; at most, it reveals Mr. Strayer's feelings about Plaintiffs' Christmas program." *Morris*, 382 F. Supp. 3d at 1100.

considered the evidence. The court's rulings are fully supported by the record and the law. For these reasons, I respectfully dissent from Sections II(a)(i)(2) and II(c) of the majority opinion, reversing the grant of JMOL as to the § 3617 claim and vacating the grant of an injunction.

The statute provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section . . . 3604 . . . of this title." 42 U.S.C. § 3617. The interference thus must be on account of a prohibited ground, such as religion. 42 U.S.C. § 3604. Even viewing the evidence in the light most favorable to the Morrises, *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, 899 F.3d 844, 847 (9th Cir. 2018), the evidence permits only one reasonable conclusion – the board was concerned with the disruption caused by holding an event of this size and scale in a residential neighborhood, not the Morrises' religion.

The majority concludes, and I agree, that the January 2015 letter could not be read as expressing "a preference that a non-religious individual purchase Mr. and Mrs. Morris' home" in violation of § 3604(c). Maj. op. at 40–41. Nonetheless, the majority relies on the letter to conclude that there is sufficient evidence to support the jury's finding that the Board interfered with the Morrises' purchase of the home on the basis of religion in violation of § 3617. Maj. op. at 28–29. I disagree that the evidence is sufficient to support this finding.

The majority first concludes that "there is evidence that the Board 'threatened, intimidated, or interfered' with the Morrises during the purchase and enjoyment of their home." Maj. op. at 22. The majority relies on the Board's January

2015 letter, which stated that the Morrises' "planned event was 'prohibit[ed]' by the CC&Rs and would 'fill [the] neighborhood with . . . hundreds of people and possible undesirables.' The letter also warned that the Board did 'not wish to become entwined in any expensive litigation.'" Maj. op. at 22–23. This evidence cited by the majority *might* support the inference that the board interfered with the Morrises' purchase of their home. However, the inquiry is not whether there was any interference, but whether there was interference "on account of" a protected ground. 42 U.S.C. § 3617. None of the statements in the letter cited by the majority support the inference that the Board interfered with the Morrises' purchase of their home because of their religion. Instead, it was clear that the Board was concerned with the scale of the event and the number of people who would be attracted to the neighborhood. The Board also was concerned that, if they allowed the Morrises to conduct the event, which violated the CC&Rs in numerous ways set forth in the letter, it might appear to non-Christians that the Morrises' Christian event was being favored, resulting in "expensive litigation." The majority also relies on the February 2015 "emergency meeting" called by the board. However, the evidence cited by the majority similarly showed the Board was not concerned with the Morrises' religion. Instead, as the majority states, the Board was concerned that the program was "an 'extravagant event generating excessive traffic,'" the Morrises "had 'not obtain[ed] the necessary permits,'" the program would violate the CC&Rs, and that "allowing such a breach of the [rules] in this matter w[ould] ultimately lead to further breaches in other areas within the community." Maj. op. at 23. Nowhere in this February 2015 meeting is there any

indication that the Board interfered with the Morrises on the basis of their religion.

Thus, neither the January 2015 letter nor the February 2015 meeting supports a finding that the Board interfered with the Morrises on account of their religion.  The majority's conclusion that "the January 2015 letter and the February 2015 meeting could have been construed by the jury as 'threatening, intimidating, or interfering' with the Morrises' purchase and enjoyment of their home" ignores the requirement that any interference be on account of a protected ground.  Maj. op. at 23.

The January 2015 letter could not have been construed as interfering with the Morrises' enjoyment of their home on account of their religion.  The only reference to religion in the letter was the statement, "I am somewhat hesitant in bringing up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up."  The rest of the letter focused on the numerous concerns raised by the size and scope of the proposed event.  For example, the draft letter, as well as the final version sent to the Morrises, stated that "a holiday festival of the magnitude you have described as well as what is demonstrated on You Tube is well beyond normal residential use," in violation of Section 5.4.1 of the CC&Rs.  The letter stated that section 5.4.2 prohibits the use of "exterior speakers, bells, whistles or sound devices," or any noise that is offensive or interferes with the quiet enjoyment of any neighbor.  It further stated that section 5.4.15 required lighting to be "restrained in its design" and that "excessive brightness" should be avoided, advising the Morrises that, although "[t]ypical holiday lighting has always been allowed," the Morrises' design exceeded the bounds of section 5.4.15.  The letter also stated that the

vehicular and pedestrian traffic generated by the events would inhibit the ability of emergency vehicles to respond to medical emergencies, noting that such emergencies occurred several times a year due to the high percentage of residents over the age of seventy.

The letter thus indicated that the board had legitimate concerns about the event's impact on the neighborhood. In fact, taken in context, the statement actually is an expression of the Board's concern that the "Christmas program, if allowed to proceed, would leave non-Christian homeowners in the West Hayden Estates with the impression that an exception was being made to the CC&Rs [the HOA's declaration establishing covenants, conditions, restrictions, and easements] in favor of Christians. Far from being intolerant, the January 2015 Letter's religious reference was an attempt to respect religious pluralism." *Morris I*, 382 F. Supp. 3d at 1100. As the district court explained, "the timeframe in which the January 2015 Letter was drafted and sent confirms that the Homeowners Association did not intend to discriminate against Plaintiffs." *Id.* at 1101. The board did not send the letter until after Morris told Jennifer Scott "that he needed a quick answer regarding whether the Board would oppose his Christmas program on the basis that it violated the CC & Rs." *Id.* Thus, "it is evident that rather than attempting to interfere with Plaintiffs' purchase of the home, the Board was in fact acting in a solicitous manner by trying to get Plaintiffs the quick answer that Mr. Morris was asking for." *Id.*

The majority then decides that the Morrises' claim relies principally on a comment by Ron Taylor, Jennifer Scott's successor as president of the board, that "someone in this association doesn't like Christmas." Maj. op. at 27. This random comment does not support a finding that the board

violated § 3617. Instead, similar to Mr. Strayer's initial draft of the January 2015 letter, this comment "has little if any relevance to the *Board's* actual intent." *Morris I*, 382 F. Supp. 3d at 1100. It merely is an expression of Mr. Taylor's opinion. There is no evidence that this was the position of the board.

The majority concludes that Mr. Taylor's speculative remark and the statement in the letter about some residents being of a different faith are sufficient evidence to support the jury's conclusion that the board violated § 3617, citing the principle that "[a] plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) (quoting *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015)). Maj. op. at 26–27. I disagree. For the reasons set forth above, neither statement supports an inference that the Board interfered with the Morrises' purchase of their home on account of religion.[2] Moreover, the majority does not consider the rest of the language in *Avenue 6E*.

_____

[2] Again, Mr. Taylor's speculative remark that someone in the HOA does not like Christmas is not an expression of the Board's position. And the statement in the January 2015 letter cannot reasonably be construed as expressing intolerance for the Morrises' religion. As the district court found, "the plain text" of the letter and "the circumstances in which it was sent also demonstrate that the Board did not intend to discriminate against Plaintiffs." *Morris*, 382 F. Supp. 3d at 1100. The initial draft of the letter, which was written by a former, rather than current, board member, and not approved by the Board, does not shed any light on the Board's motives, and the letter that was sent showed the Board's concern not to be seen as favoring the Morrises. In fact, the majority's reliance on the letter to support a finding that the Board interfered with the Morrises' purchase of their home on account of religion is inconsistent

*Avenue 6E* addressed Equal Protection and Fair Housing Act disparate treatment claims against the City of Yuma based on the City's "refusal to rezone land to permit higher-density development." *Ave. 6E*, 818 F.3d at 496. In reversing in part the district court's dismissal under Rule 12(b)(6) and grant of summary judgment, the court relied on *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), to determine whether, "it is plausible that, in violation of the FHA and the Equal Protection Clause, an 'invidious discriminatory purpose was a motivating factor' behind the City's decision to deny the zoning application." *Id.* at 504 (quoting *Arlington Heights*, 429 U.S. at 266). Although discriminatory intent need not be "'the sole purpose of the challenged action,'" the evidence is not examined in a vacuum. *Id.* (quoting *Arce*, 793 F.3d at 977). Instead, "[t]he court analyzes whether a discriminatory purpose motivated the defendant by examining the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact." *Id.*

*Avenue 6E* and *Arlington Heights* do not teach us that, if there is one piece of evidence that might be construed as supporting the plaintiffs' position, despite all the evidence pointing in the other direction, that is sufficient to establish that discriminatory intent was a motivating factor in the decision. To the contrary, we are to examine evidence such as "the events leading up to the challenged decision and the

---

with the majority's conclusion that the letter does not support a finding that the Board preferred that a non-religious person purchase the Morrises' home.

legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision" to determine "whether a discriminatory purpose motivated the defendant." *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

Although the situation here does not involve evidence such as legislative history or departure from normal procedures, there is plenty of "circumstantial and direct evidence of intent," *id.*, that clearly establishes that a discriminatory purpose did not motivate the board.

In Mr. Morris' initial conversation with Ms. Scott, who was then president of the HOA, he explained "the whole show and what he wanted," and told her that he had already examined the CC&Rs and wanted to meet with the Board. After hearing about the program, Ms. Scott invited Mr. Morris to a board meeting to explain what he wanted, but he did not attend. When Ms. Scott described the Christmas program to the Board, "they started asking [her] questions about the lights, about the traffic." The board members looked up the event on Facebook and became concerned about the lights, the number of attendees, the traffic, and possible violations of the CC&Rs. After this meeting, Ms. Scott called Mr. Morris and told him that the Board could not give him an answer because the members were

concerned and "wanted to look through the CC&Rs before they gave him an answer."**[3]**

Mr. Morris himself testified that when he and his realtor met with the Board on January 27, 2015, the concerns the Board raised were traffic and the number of people the event would bring to the neighborhood. Similarly, when the board called an HOA meeting in February 2015, the Board informed the membership that a "potential buyer" wanted approval to hold a five- to ten-day holiday event at his home that he stated would "produce in excess of 900 additional vehicles traveling through the neighborhood with up to 80 volunteers directing traffic and such." Mr. Morris further "indicated that he will be using a speaker/PA system from 6 pm - 9 pm nightly." The Board informed the membership that, the prior year, Mr. Morris "incorporated a camel and various other amenities to attract attention to his display," and that "he plan[ned] to create a much larger event" when he moved to West Hayden Estates. The Board expressed the opinion that, "while we encourage holiday decorating and community participation, this type of traffic and event is in violation of the CCRs for West Hayden Estates." The Board never displayed any concern about the Morrises' religion. At the meeting, the concerns raised by other homeowners were about traffic, buses, and the number of people. There

---

[3] Ms. Scott further testified that she was a Christian, that her husband was a pastor, and that she told the Board at this meeting that she had in fact gone to the show in 2014, before the Morrises moved to West Hayden Estates. As the district court reasoned, the fact that "several Board members were practicing Christians," and that Ms. Scott "is both a practicing Christian and married to a Christian minister," "significantly decreases the probability that the Board intended to discriminate against [the Morrises] based on a faith shared by both [the Morrises] and several Board members." *Morris I*, 382 F. Supp. 3d at 1103–04.

is nothing in the record from which a reasonable juror could conclude that the board's opposition to the event was based on anything other than the effect on the neighborhood of the buses, crowds, traffic, animals, and noise.[4]   Finally, the timing of the letter indicates that it was sent in response to Mr. Morris' request to know if the Board "would oppose his Christmas program on the basis that it violated the CC&Rs," and the letter itself shows that the Board was concerned with the numerous ways in which the program would violate the CC&Rs. *Morris*, 382 F. Supp. 3d at 1101.

The majority's conclusion that an "anti-Christian purpose was at least *a* motivating factor in the Board's conduct" can be supported only by taking these two statements – Mr. Taylor's speculative remark and the statement in the letter that some of the residents are not Christians or of another faith – out of context and ignoring all the other evidence. Maj. op. at 29. This reasoning is not supported by *Avenue 6E* and *Arlington Heights*.

Because I believe the district court properly granted JMOL on all of the Morrises' claims, I conclude that the district court did not abuse its discretion in granting the HOA's request for a permanent injunction. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019) (per curiam) ("We review for abuse of discretion the district court's decision to grant a permanent injunction."). I need not repeat the court's careful findings, but, after reviewing the record, including Mr. Morris' own testimony, photos, flyers, the Morrises' Facebook posts, and videos of the event, it is clear that the programs violated the CC&Rs in numerous,

---

[4] This brief summary does not include all the other evidence of the numerous ways in which the Christmas program egregiously violated the CC&Rs. *See Morris I*, 382 F. Supp. 3d at 1111–13.

substantial ways that were extremely disruptive to the neighborhood and unlike any of the examples to which the Morrises compared their events.  The district court did not abuse its discretion in enjoining the Morrises from holding the programs in a manner violating the CC&Rs.  I therefore dissent from the majority's decision to vacate the injunction.[5]

Because all of the district court's rulings are supported by the law and the record, I respectfully dissent from the majority's decision to reverse the grant of JMOL as to the § 3617 claim and vacate the injunction.  I would affirm the district court in full.

---

[5] Although the majority does not address the question of whether remittitur was appropriate, Maj. op. at 42 n.11, the district court did not abuse its discretion in ordering remittitur.  *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014) ("We review for abuse of discretion a remittitur amount set by the district court.").  It is clear that Mr. Morris' testimony that he wanted closing and moving costs for when he decided to move, at some unknown date in the future, is too speculative to support the $60,000 award of compensatory damages.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 824 (9th Cir. 2001) ("'Although compensatory damages need not be determined with certainty, they may not be based upon "mere speculation or guess."' (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931))).  "The combination of Mr. Morris' uncertainty, and the fact that Mr. Morris was the sole source of evidence supporting a *projected* damages amount" support the district court's conclusion that "the jury's award of damages was both speculative and not supported by the evidence."  *Morris I*, 382 F. Supp. 3d at 1106.  The district court also properly concluded that the $15,000 punitive damages award was problematic because the Morrises presented no evidence the HOA acted with evil intent, nor any evidence of Mr. Morris' alleged medical condition or the extent to which it was aggravated.  *Id.*

COLLINS, Circuit Judge, concurring in part and dissenting in part:

In late 2014, Jeremy and Kristy Morris[1] offered to purchase a home in the West Hayden Estates First Addition neighborhood ("West Hayden Estates") in Hayden, Idaho. Hoping to continue their tradition of hosting an annual Christmas celebration outside their home, they inquired of the West Hayden Estates First Addition Homeowners Association ("HOA") whether it foresaw any problems with doing so. In response, the HOA sent the Morrises a certified letter taking the position that such an event would violate the West Hayden Estates Covenants, Conditions, Restrictions, and Easements ("CC&Rs") and expressing concerns that the proposed event could present "problems" for "some of our residents [who] are non-Christians or of another faith" and that it would attract "undesirables." When the Morrises expressed offense at this openly discriminatory letter, the HOA responded by ginning up opposition among the neighborhood to the Morrises. Even before the Morrises closed escrow on their new home, the HOA called an emergency meeting of the entire HOA, and in advance of the meeting, it circulated a misleading letter that misrepresented the size and scope of the planned event. The HOA's efforts bore the foreseeable fruit—the HOA members at the meeting unanimously opposed the Morrises' planned Christmas event, and the Morrises were met with significant hostility after they moved in and proceeded to hold the event anyway. Indeed, one neighbor confronted Kristy in her driveway one

---

[1] To avoid confusion, I refer to the Morrises individually by their first names. By contrast, all other individuals are referred to by their last names.

evening, telling her that "we have enough guns and ammunition that will take care of you."

The Morrises subsequently filed this suit asserting that the HOA's conduct in connection with their purchase of their home violated multiple provisions of the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq*. The jury returned a verdict for the Morrises, but the district court granted judgment for the HOA as a matter of law. Alternatively, the district court conditionally granted a new trial and ordered a remittitur of the compensatory and punitive damages awards. The Morrises have timely appealed.

I agree with the majority's conclusions that the district court erred in granting judgment as a matter of law on the Morrises' claim under § 818 of the FHA, *see* 42 U.S.C. § 3617, and that this error prejudicially affected the district court's analysis of the HOA's counterclaim for injunctive relief enforcing the CC&Rs against the Morrises. I therefore concur in Parts II(a)(i)(2) and II(c) of the majority opinion. However, because the district court also erred by concluding that judgment as a matter of law was warranted for the HOA on the remaining claims, as well as by conditionally awarding the HOA a new trial and remittitur, I respectfully dissent in part.

# I

## A

In October 2014, Jeremy had the idea to celebrate Halloween by stationing a cotton-candy machine in front of his home in the Grouse Meadows section of Hayden, Idaho and providing cotton candy to passing children. The Morrises perceived this Halloween event to be a success, and Kristy suggested doing something similar for Christmas.

The Morrises decided that such an event would be a way to "reach[] out to people who typically don't attend church" and to invite them to "celebrate Christmas with us, to celebrate the birth of Christ." Jeremy sought logistical assistance from others he knew in a Christian fellowship group, and he also talked to his pastor about the idea. After speaking with his pastor, Jeremy "came away with an impression that, rather than doing like a massive preachy thing," he should start with "little Christian elements" and add "more and more every year."

Accordingly, the Morrises settled on a plan to decorate their Grouse Meadows home with a substantial display of Christmas lights and to stand outside with their daughter, offering cotton candy, candy canes, and hot chocolate to drivers viewing the lights. They posted their planned Christmas celebration on Facebook, and more than 200 families indicated that they planned to attend. A neighboring church agreed to offer its parking lot to drivers visiting the home, and local police confirmed to the Morrises that their planned event would not require any permits.

Thereafter, the Morrises held their 2014 Christmas event for eight days. Each night, they turned on their Christmas lights and offered cotton candy and hot chocolate for about two hours. The Morrises arranged for a friend to dress up as Santa Claus, and they set up a table to accept donations for two local charities for children. They also organized the singing of Christmas carols, using songs that were "Christian based." Although they did not otherwise have a live nativity scene for this 2014 event, the Morrises did incorporate a live camel into their Christmas display. About 20 to 25 volunteers helped the Morrises put on their 2014 Christmas event in Grouse Meadows. Kristy estimated that between 20 and 100 people attended each night, the volunteers who

assisted suggested that "hundreds" came, and the Facebook page indicated that a total of 1,700 people claimed to have visited over the eight days.  The Morrises received no complaints about the event.

Shortly after Christmas, the Morrises began looking for a new home.  On New Year's Eve 2014, they put down an offer to purchase the home of Larry and Christina Breazeal in the West Hayden Estates neighborhood of Hayden.  Larry Breazeal was a former president of the HOA, and the Breazeals had lived in the neighborhood for approximately 15 years at that point.  On January 6, 2015, the Breazeals reached an agreement to sell their home to the Morrises.

Around the same time, Jeremy began to inquire about whether he could host a similar Christmas event in the new neighborhood.  He reviewed a copy of the West Hayden Estates CC&Rs, and concluded that they would not prohibit such a Christmas program.

In early January 2015, Jeremy called Jennifer Scott, who was then the president of the HOA, to discuss the matter. Jeremy informed Scott that he had contracted to purchase a home in the neighborhood and that he was planning to continue to host a Christmas program each December after he moved in.  During the call, Jeremy explained to Scott "various details about what that program entailed."  Jeremy also explained to Scott the religious motivation behind the event.  He did not use language suggesting that he was asking for permission, and instead he informed her that he was "calling to reach out and be neighborly" and to discuss certain issues.

In particular, Jeremy noted that, because the CC&Rs prohibited "external speakers," he would *not* use that feature of the Grouse Meadows 2014 Christmas program at West

Hayden Estates.  Instead, he said that he might "just have music inside my home just with the windows down." Jeremy also noted that, at West Hayden Estates, he would not have access to a nearby church parking lot to handle visitors, and so he suggested that perhaps "shuttles" could be used to avoid any safety or logistical issues.  Jeremy asked for a prompt meeting of the HOA board because, as Scott put it, "[h]e wanted to make sure that the board was on the same page with him."  Jeremy told Scott that he needed a quick response from the HOA board, because he was facing a deadline for getting out of the home purchase contract.

Scott arranged an emergency meeting of the HOA board for the next day.  Although she recommended that Jeremy meet the board himself, he was sick that day and missed the meeting.  Jeremy asked Scott to call him so that he could join the meeting by phone.  However, after the meeting began and Scott perceived the significant level of concern about potential CC&R violations among the board members (many of whom had just joined the board), she decided that she would not telephonically patch Jeremy into the meeting. Jeremy texted Scott while she was in the meeting and he tried to call her several times, but she did not answer or respond. After the meeting was over, Scott called Jeremy and explained that she did not telephonically include him in the meeting "because the board was really concerned, and they were asking a lot of questions, and they wanted to look through the CC&Rs before they gave him an answer." Jeremy got "upset" with Scott during the call, because, as Scott later explained, "[h]e just didn't understand why [she] didn't call him in when [she] told him that [she] would."

During the HOA board meeting from which Scott had excluded Jeremy, Scott described her understanding of the Christmas program.  Scott told the board members that the

Morrises "wanted to continue putting on a [Christmas] light show" that "would be held for . . . five days" and that it involved volunteers and traffic control in addition to providing cotton candy and hot chocolate.  Because Scott had "liked" and "was following" the Facebook page concerning the Morrises' 2014 event, she was able to pull up that page on her phone and show it to the other board members.  The Facebook page's report of the large number of attendees "drew a lot of concerns" from board members. Scott also reported to the board that, on one of the days the 2014 event was conducted, she personally drove by the Morrises' house in Grouse Meadows about 20 minutes before the event was scheduled to start, and she saw "lots of cars on the street."  When later asked about the board meeting at trial, Scott acknowledged that she "may have mentioned something" about "Mr. and Mrs. Morris's Christian faith."

After the board meeting, most of the members were able to review the CC&Rs, and several of them concluded that a program like the 2014 one would violate some of the CC&Rs.  Given Jeremy's request for a prompt response, one of the board members suggested that Scott write him a letter outlining the board's concerns, and Scott in turn delegated the task to Larry Strayer, a former member and president of the board who had been at the emergency meeting.

After drafting the letter, Strayer circulated it to the board for comments on the afternoon of January 14, 2015.  The draft letter stated that the Morrises' Christmas program would violate three CC&Rs: (1) the program would constitute a use of the property for a purpose "other than for single family residential purposes"; (2) the noise generated by the event would constitute a "nuisance"; and (3) the Morrises' Christmas lights would violate a provision

requiring exterior lighting to be "restrained" and not to involve "excessive brightness." The letter also expressed concern that the traffic generated by the event could impede ingress and egress of emergency vehicles that might need to get to homes in the neighborhood. The draft letter then closed with the following paragraphs:

> And finally, I am somewhat hesitant in bring up the fact that some of our residents are avowed atheists and I don't even want to think of the problems that could bring up.
>
> It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in any expensive litigation to enforce long standing rules and regulations and fill our neighborhood with the riff-raff you seemed to attract over by WalMart. Grouse Meadows indeed!!! We don't allow "those kind" in our neighborhood.

On the morning of January 15, Pat Keilig, a board member, forwarded her comments on the draft letter to Scott, the board's president, and to Ron Taylor, the board's vice-president. Keilig stated that she thought the letter was "great" and that she "only question[ed] the last line." She thought that "it could end at riff-raff and could then say— this neighborhood is not Grouse Meadows." Taylor suggested stopping at "long standing rules and regulations" (which would remove the reference to "riff-raff" that Keilig would have retained) but that the reference to "litigation" should also be removed. About 3½ hours later, Keilig circulated a revised draft of the letter. She reported that she

"changed the atheist bit and toned it down but left the paragra[p]h in."

The next morning, January 16, Keilig mailed the final version of the letter to Jeremy, using certified mail with a return receipt requested.  Keilig stated at trial that, at the time she mailed the letter, she thought she had the approval of the board to do so, but that she later realized that the letter had not actually been "signed off" by the board.  The final version of the letter was verbatim the same as the original, except for the correction of some typographical errors and two substantive changes.  First, the final letter added the following concluding sentence to the prior paragraph about ingress and egress of emergency vehicles: "Snow removal at that time is also a concern, excess cars on the street would hinder that."  Second, the closing two paragraphs were revised to read as follows (with the revised language shown in boldface type):

> And finally, I am somewhat hesitant in **bringing** up the fact that some of our residents are **non-Christians or of another faith** and I don't even want to think of the problems that could bring up.

> It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in any expensive litigation to enforce long standing rules and regulations and fill our neighborhood with the **hundreds of people and possible undesirables.  We have worked hard to keep our area peaceful, quiet, and clean.  Neighbors respect the CC&R's and show common**

**courtesy to those around them.  These are
reasons why people want to live here.**

Board reactions to the letter were mixed.  Larry Breazeal
remarked that he and his wife both viewed the letter as
"prejudiced against the Morris[es'] Christian religion."
Breazeal also stated that Scott called him and was
"distraught about the letter" because it "included a statement
that talked about not wanting the Morris family to push their
religious beliefs on others in the neighborhood."  In her
conversation with Breazeal, Scott claimed that the board had
"debated over" that sentence and "had decided to not include
[it] in the letter."  However, at trial, Scott stated that she did
not view the letter's second-to-last paragraph to be
"discriminatory against Christians."  She testified, though,
that, had she drafted the letter, she "would have just stuck
to" the board's concerns about "the violations of the
CC&Rs."  Although Taylor's email commenting on the draft
letter had said nothing about removing its reference to
religion, Taylor later claimed at trial that, on the day after he
sent that email, he complained to Scott about that reference,
only to be "told that the letter had already been sent."

Scott testified that, in the days after Jeremy received the
letter, he called her at least five times.  She said that, in one
of those conversations, Jeremy complained about what he
perceived as the escalation inherent in sending a certified
letter, saying words to the effect, "How dare you send me a
certified letter.  Do you have any idea what certified letters
mean?  Do you know how offensive getting a certified letter
is?"

After receiving the letter, Jeremy called Scott again and
recorded the conversation.  During that call, Scott informed
Jeremy that a majority of the board had concerns about the

event and wanted to ask him questions.  Jeremy asked Scott what she told the board regarding the January letter, stating that "I'm not meeting with anybody until I know what kind of people I'm meeting with. . . . I know you're a nice person but I don't know who these people are."  Scott indicated that the best path forward was for both sides to meet and suggested that accommodation was possible if Jeremy could help resolve the "biggest issue," the expected traffic load.  Later in the call, she stated that "nobody cared about the Christmas lights."

Over the course of the call, Jeremy expressed frustration over the January letter.  He asked Scott, "Are they apologetic?  Do they—do they realize what they did?"  Scott responded, "Yes."  Jeremy later asked, "Regarding the letter, I mean did you tell them—did you say, 'you guys, this was discriminatory language, even if you didn't intend it this way'?"  Scott confirmed that she had.  In response to Jeremy asking whether she informed the board he might sue over the letter, Scott reported that she had not, but that she did warn the board that the letter "was discriminatory language."

Jeremy then informed Scott that he was in contact with a "religious liberties organization" and was considering legal action against the HOA over the letter.  Jeremy told Scott that the organization informed him that the HOA had violated federal law, and that it was interested in taking his case and was "ready to go."  However, he said, "we can all walk away from this" if the board accepted his demands.  Those demands, which he presented as non-negotiable, were that the HOA either de-annex his home from the HOA or sign a contract exempting him personally from payment of HOA dues, exempting his Christmas event from the CC&Rs, and requiring the resignation of any board members involved in the current dispute.  Jeremy told Scott that the board had

one week to accept his offer, or else he would file suit against the HOA and send a letter to all residents of the development informing them of his grievances. Jeremy also threatened to share his grievances with the local press and suggested that legal costs for the HOA might run as high as $60,000. In response to Jeremy's threats of legal action, Scott assured him that "nobody cares that you are a Christian." In another phone call with Jeremy, Scott reportedly indicated that she convinced the board to "tone down" the letter between drafts.

On January 27, Jeremy and his realtor met with the full board. Although not present in person, Jeremy's attorney also joined the meeting telephonically. The Morrises' realtor described the board members at the meeting as "extremely agitated" and "hostile." In his view, "it wasn't like a productive meeting," but rather "more of yelling" as the board discussed the Morrises' "Christmas light thing . . . and the fact [that the board] didn't want it in their neighborhood." The realtor described one attendee as "very, very angry" and noted that another, Angie Penzkover, "stood up and left" approximately "halfway through the meeting."

The board members reiterated their concerns about the CC&Rs from the letter, in particular the amount of traffic and number of people who would attend the event. After Jeremy proposed a plan to address the increased traffic load, some members of the board indicated that it would sufficiently address their traffic concerns. At the meeting, at least one member of the board said that he did not believe the CC&Rs covered the use of Christmas lights at all.

In response, Jeremy again proposed that the particular home that he sought to buy be de-annexed from the HOA, which would eliminate the HOA's authority over the home

as well as the Morrises' obligation to pay dues or fees. Jeremy stated that, if the home were de-annexed, he would agree not to sue the HOA. The board declined, concluding that it lacked any power under the CC&Rs to agree to de-annexation.

About two and a half weeks after the January 27 meeting, the board announced that an emergency meeting of the full membership of the HOA would be held on February 13, 2015 at the home of Angie Penzkover (the board member who had walked out of the coffee shop meeting). The ostensible purpose of that meeting was to explain the situation to the membership and solicit the residents' input. At the board's request, a notice announcing the meeting was prepared by the HOA's management company and was distributed to all residents. The notice included the following language:

> A potential buyer is looking to purchase a home within the development. He has requested approval to hold a holiday event that will last from 5-10 days during the month of December. This display/event was held in another development last year. In speaking with the gentleman, he has indicated that this "event" will produce in excess of 900 additional vehicles traveling through the neighborhood with up to 80 volunteers directing traffic and such. He has indicated that he will be using a speaker/PA system from 6 pm – 9 pm nightly. Last year, he incorporated a camel and various other amenities to attract attention to his display. . . .

In the newspaper article that was provided in the Spokesman Review of the situation last year, he did not obtain the necessary permits for such an extravagant event generating excessive traffic.  His comment to the media was that this year, he plans to create a much larger event.  . . .

It is the Board's opinion that . . . this type of traffic and event is in violation of the CCRs for West Hayden Estates.  . . .

The board is seeking your opinions on the matter as the individual has threatened legal action if the board does not permit his request.  The board is fearful that allowing such a breach of the CCRs in this matter will ultimately lead to further breaches in other areas within the community.  . . .

Unfortunately, this may result in a legal situation that must be addressed and handled immediately.

A separate sheet announcing the agenda for the meeting referenced this item with the following description: "Discussion regarding possible litigation that may involve additional legal costs and increased assessments."  That notice also stated that, because the topic "affects ALL residents of the West Hayden HOA," each member should "attend or submit" an enclosed "proxy form."  The proxy form gave the HOA member the option of either (1) allowing the board to cast the member's vote at the board's discretion; or (2) specifying a vote either "to allow new resident's holiday event and display" or not to allow it.  The proxy form

reiterated, in bolded, underlined large type that used all capital letters: "**IF YOU CANNOT ATTEND, IT IS CRUCIAL THAT YOU RETURN THE PROXY.**"

At the February 13 meeting, approximately 19 homeowners "were represented," not counting board members. The homeowners in attendance asked about the amount of traffic that was anticipated, focusing on the number of buses that might be coming and the overall number of attendees. At the conclusion of the discussion, the vote was unanimous that those in attendance "did not want [the Christmas event] to take place." It is not clear from the record whether the board ever formally notified the Morrises of the outcome of this meeting.

Believing that the HOA's written notice announcing the February 13 meeting to the membership was "knowingly false and misleading," Jeremy soon sent a letter of his own. In that letter, Jeremy alleged that the HOA had discriminated against his family, had violated the Fair Housing Act, and had refused his attempts to settle the matter amicably. His letter also identified several statements made in the board's meeting notice that he considered to be false. In particular, he took issue with the board's characterization of the size and duration of the Christmas event, and its assertion that the event would violate the CC&Rs.

## B

The Morrises closed escrow on their new home in March 2015. In September of that year, Scott noticed that Jeremy began putting up outside lights in preparation for the Christmas event. On October 26, attorneys for the board sent a four-page letter to the Morrises instructing them not to hold the event. The letter listed the various CC&R provisions the board believed the Morrises' planned event would violate,

including provisions prohibiting nuisances, excessive lighting, and the keeping of animals. The letter specifically asserted that the "exterior lighting you have already installed on your home" violated the CC&Rs. The letter further argued that the county zoning ordinance and Idaho law would independently prohibit the Morrises' planned event. The letter acknowledged that the Morrises hoped to mitigate the HOA's traffic concerns by the use of shuttle buses, but the letter claimed that those measures would be inadequate because nothing would stop visitors from "simply driving to the neighborhood and parking on the streets." The letter warned that unless the Morrises "request[ed] and receive[d] written approval" from the board to conduct their Christmas event, the board had authorized its attorneys "to file an action seeking an injunction to prevent your event from occurring and seeking an award of all legal fees and costs incurred in that litigation." The letter concluded by stating that, if the Morrises did not reply in writing within 10 days, "the Board will assume that you are unwilling to modify your plans and legal action will follow." After receiving the letter, the Morrises decided that they "should tell them that . . . we're not backing down if they want to file a lawsuit." After Jeremy contacted the media about the dispute, the HOA ended up not pursuing any legal action.

The Morrises went forward with the planned Christmas event, which lasted five days. The Morrises strung up over 200,000 lights on their home and had roughly 30 volunteers, a party bus, a costumed Santa Claus and Mrs. Claus, a nativity scene with live animals, and a children's choir performing carols. Several attendees testified that the noise was minimal. Indeed, the Morrises' next-door neighbor testified that she could not hear any noise from the event when she was in her home. As a general matter, the event

premises were also cleanly maintained, although on at least one occasion a child reportedly urinated on the lawn of one of the Morrises' neighbors and Ron Taylor reported picking up "a few cups and some stir sticks" the next morning.

The 2015 event was also attended by more visitors than the one the prior year in Grouse Meadows, although the testimony at trial conflicted as to just how many visitors attended.  One witness testified that between 30 and 50 people were present on the Morrises' lawn at any given time, whereas another witness estimated that "a couple [of] hundred" people were present at "any single time."  The trial witnesses also disagreed about how much traffic the event generated.  The descriptive materials prepared by the Morrises to advertise the event stated that "[a]ll vehicles must part at Croffoot Park"; that shuttle buses would run every 10 minutes between the park and the event; and that "NO PARKING [was] permitted on Ferndale Dr. where [the] event [was] held."  One witness testified that the event nonetheless produced a significant volume of traffic, whereas other witnesses testified that the event generated minimal excess traffic.  Taking "a wild guess," one witness placed the total number of cars driving past the Christmas event over the course of a given evening at 50.  Witnesses also disagreed about how many cars ended up parking in the streets of the neighborhood during the event.

The HOA board pursued no immediate action against the Morrises with respect to the 2015 event.  Indeed, the board's only response to the 2015 event was in the form of a January 2016 letter to the Morrises from Taylor, the new president of the board.  That letter noted that a child had been seen urinating in the snow, and it complained about poor trash pickup following the event.  After reading the January 2016 letter, Jeremy spoke with Taylor outside the Morrises' home,

again recording the conversation. Jeremy reported to Taylor that the Morrises had received threats and harassment, and reiterated his view that the board had engaged in discrimination against his family. Jeremy asked Taylor, "why does everyone keep coming after me?" Taylor replied, "Because someone in this association doesn't like Christmas."

The Morrises decided to repeat the event in December 2016. The 2016 event was similar in scope to its predecessor. It again included over 200,000 Christmas lights, although Jeremy testified that the 2016 event was the first time that he left the lights on past 8:30 PM. The 2016 event featured costumed characters such as Santa Claus, the Grinch, Frosty the Snowman, Clifford the Big Red Dog, and Roman soldiers; a professional photographer for paid photos with Santa; a live nativity scene that included "Dolly" the camel; and a petting zoo with a miniature donkey. The Morrises also invited live musicians, one of whom used a speaker to amplify his performance. Jeremy also stated that, in contrast to 2015, he occasionally used a bullhorn to amplify his voice.

Scott testified that the traffic at the 2016 event was roughly the same as the year before, although other neighbors described the traffic as being slightly lower than in 2015. The 2016 event also included about 30 volunteers. In 2016, buses were again used to ferry visitors from the parking site to the Morrises' home. Some residents placed cones in front of their driveways to prevent visitors parking there, and one witness testified that, over the course of the week, some residents moved the cones progressively further into the street, thereby themselves obstructing traffic.

The HOA board again took no immediate action in response to the 2016 event.  It never notified the Morrises that they had violated the CC&Rs.

## C

Although the board took no formal action in response to the events, the Morrises contended that the board's early and subsequent opposition led to significant hostility in the neighborhood.

In particular, in the leadup to the 2015 event, a West Hayden Estates resident named Larry Bird came to the Morrises' house in an agitated state and told Kristy in the driveway, "If you think the three-percenters are going to protect you, we have enough guns and ammunition that will take care of you."  (The "three-percenters" was apparently a reference to a militia group that is active in the surrounding area.)  Jeremy told the board about the threat, but it took no action in response.  Kristy was sufficiently concerned about Bird's threat that she and the Morrises' four-year-old daughter stayed away from the house during the 2015 event.

Other expressions of hostility emerged as well.  In the aftermath of the February 2015 board meeting, Angelene Cox, a West Hayden Estates resident who lived adjacent to the Morrises, called Scott and asked whether the HOA's complaints about the CC&Rs were genuine.  In response, Scott told her that, "They just don't want him there."  Cox further reported in an affidavit that "[s]ome neighbors openly referred to [the Morrises] as 'the enemy.'"  Jeremy also submitted an affidavit asserting that in December 2016, a neighbor named "Dolly M." "placed a rotating laser on a swivel in her driveway which directed several laser beams through my family's bedroom window."  He further stated that, in January 2017, his family's Christmas lights were tied

to a rope and dragged down the street by a car, although he could not identify a culprit.

Residents also expressed hostility during the Christmas programs. One neighbor pretended to be hit by one of the Morrises' buses, "flail[ing] his arms . . . like he was falling down" while "a person with a video camera" filmed the incident. Thereafter, another neighbor shoved one of the Morrises' volunteers while confronting the bus driver over that alleged incident. Other neighbors shouted obscenities outside the Morrises' home during the event. At least one resident kicked a visitor's car while cursing at the Morrises. And other residents harassed visitors, shouting obscenities at them and telling them they were not welcome in the neighborhood.

The Morrises claimed that the treatment they received was not consistent with how other events were handled at West Hayden Estates. For example, the HOA hosts an annual block party, which involves the complete closure of multiple streets within the development. The board has also taken no action against an annual Fourth of July party, involving allegedly illegal fireworks launched from the streets of the development and lasting until after midnight. The Breazeals also reported having regularly hosted parties to watch football games throughout the football season and postseason, with anywhere from 20 to 80 persons in attendance and as many as 50 vehicles parked on the neighborhood streets. The Breazeals' football-watching parties lasted for over four hours each, but the Breazeals reported that they were never contacted by the HOA regarding the parties. Larry Breazeal also stated that, during his entire tenure as the HOA president, the board had never sent a notice of violation of the CC&Rs for events causing a nuisance. However, no event appears to have extended over

multiple days and none replicated the scale of the Morrises' Christmas program.

The Morrises ultimately claimed that the neighborhood was no longer hospitable for them. Jeremy testified at trial that "I don't see how I can continue to live in this neighborhood," in light of the alleged discrimination, threats, and harassment.

**D**

In January 2017, the Morrises sued the HOA under the Fair Housing Act ("FHA"), which has been classified, as amended, to chapter 45 of the unenacted Title 42 of the United States Code. *See* 42 U.S.C. § 3601 *et seq*.

In their first cause of action, the Morrises allege that the HOA violated § 804(b) and § 804(c) of the FHA. Section 804(b) makes it unlawful, *inter alia*, to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of . . . religion." 42 U.S.C. § 3604(b). The Morrises alleged that the HOA violated that provision when it engaged in "a systematic strategy to . . . dissuade the Morris[es] from moving to their home . . . under the threat of litigation," attempted to "dissuad[e]" the Breazeals "from selling the property to the Morris family," and "creat[ed] a hostile living environment in an effort to discourage the Morris family from continuing to live in the association." Section 804(c) makes it unlawful, *inter alia*, to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference . . . based on . . . religion." *Id*. § 3604(c). The Morrises claim that the HOA violated this provision by sending its January 16 letter, which the Morrises allege "indicated a preference for non-religious homeowners."

The Morrises' third cause of action alleged a violation of § 818 of the FHA. Section 818 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" § 804 of the FHA. *Id*. § 3617. The Morrises allege that the HOA violated § 818 by "sending a certified letter threatening litigation"; "contacting the [Breazeals] and attempting to dissuade them from selling to the [Morrises]"; and causing the Morrises to "live[] in fear, keep[] their doors locked at all times, and obtain[] concealed carry permits for protection."[2]

The HOA denied the allegations and counterclaimed against the Morrises. In their counterclaim, the HOA alleged that the Morrises' 2015 and 2016 Christmas events violated the CC&Rs and it sought an injunction against future such events.

Before trial, the district court denied the HOA's motion for summary judgment on the Morrises' FHA claims, concluding that a reasonable jury could find for the Morrises on these claims. The district court specifically stated, "I really think that if I were to grant summary judgment [to the HOA], I think the Ninth Circuit would reverse me almost immediately." The court explained:

> I think the letter—it may well be, you
> know . . . that there was not even the least bit
> of discriminatory intent in writing the letter.
> It may have been an attempt to offer some

---

[2] The Morrises' complaint's second cause of action asserted a state-law claim under Idaho Code § 67-5909, but the district court dismissed that claim for failure to exhaust state administrative remedies, and the Morrises have not appealed that dismissal.

type of conciliation or recognition of sensitivity to others' religious beliefs.

The problem, though, is the summary judgment standard, which requires that the court construe the evidence and any reasonable inference that can be drawn from the evidence in a light most favorable to the plaintiff.

So the question is whether a jury could, in viewing that statement contained in the letter and, in particular, coupled with the other evidence of statements made about wanting to get the plaintiffs out of the neighborhood, whether or not a reasonable jury could view that as evidencing a discriminatory intent.

And I just have to say: I think they could. I'm not saying that they will. I'm not in any way suggesting that, at a jury trial, that the jury is going to come back and agree with the Morrises. I'm just saying that applying the summary judgment standard to the facts of this case, which is what I have to do, that the plaintiffs have presented sufficient evidence really in the form of the letter almost by itself. But even if I made a statement earlier that the letter by itself wasn't enough, that probably wasn't well advised because I think that reference to impact upon other—'others in the area that may not be Christian,' that coupled certainly with the statements that— of kind of personal animus, I think, is enough

> that a reasonable jury could concluded that
> there was, in fact, a discriminatory motive.

The ensuing jury trial lasted six days.  After the Morrises rested, the HOA moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  The district court denied the motion, stating "I've got some reservations about the claims here.  However, I think there is enough evidence that, if you construe it in a light most favorable to the plaintiffs, a reasonable jury could find that each element of the claim has been made."  Referring back to its summary judgment decision, the district court said, "[T]hat [January 16] letter is the linchpin, I think, why summary judgment was denied and why I'm going to deny the Rule 50 motion as well.  I think a jury could infer that they were trying to prevent someone from purchasing the home and that at least part of the motivation was religion."

The jury returned a verdict in favor of the Morrises. Between announcing that the jury had reached a verdict and revealing that verdict, the jury asked the district court whether it could award "legal fees" as punitive damages, rather than a specific dollar amount.  The court stated that "there is no evidence as to attorneys' fees, and . . . the instruction tells them what the purpose of punitive damages is.  And I don't think it can be tied to anything like attorneys' fees."  The district court therefore instructed the jury that it could not award "legal fees" in lieu of a specific punitive damages award.

Approximately 40 minutes after the district court informed the jury that it could not award legal fees, the court reconvened with the jury present.  At that time, the verdict was read, and the court announced the jury's award of damages.  The jury found the HOA liable to the Morrises on

all of their claims. It awarded the Morrises $60,000 in compensatory damages and $15,000 in punitive damages.

Following trial, the HOA filed a renewed motion for judgment as a matter of law under Rule 50(b). Notwithstanding its comments in denying the earlier summary judgment motion and Rule 50(a) motion, the district court concluded that no reasonable jury could find for the Morrises and that the only conclusion permitted by the evidence was that the HOA was not liable on any ground. The court therefore entered judgment in favor of the HOA on each of the Morrises' claims. Turning to the HOA's counterclaim against the Morrises, the court granted the HOA's request for a permanent injunction against the Morrises, barring them from "hosting a Christmas program in the West Hayden Estates that violates the CC&Rs in the manner described in this decision." The district court also made two alternative rulings. First, in the event that its entry of judgment as a matter of law were reversed, the court conditionally granted the HOA a new trial. Second, in the event that its grant of a new trial were also reversed, the court ordered remittitur of the Morrises' damages to $1 for each of their claims and $1 in punitive damages. The Morrises timely appealed.

## II

Even after a jury has rendered its verdict, a district court may enter a contrary judgment as a matter of law if it concludes that no reasonable jury could have found for the prevailing party based on the admissible evidence in the record. FED. R. CIV. P. 50(a), (b). We review the decision to enter such an order de novo. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 995 (9th Cir. 2020). We must ask "whether the evidence permits only one reasonable

conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). However, in making that determination, we may not reweigh the evidence ourselves, *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009), and must keep in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

I concur in the majority's opinion to the extent that it concludes that the Morrises presented sufficient evidence to permit a reasonable jury to find in their favor on their third cause of action under § 818 of the FHA. But I believe that the district court also erred in entering judgment as a matter of law on the Morrises' claims under § 804(b) and § 804(c), and I therefore dissent from the majority's contrary conclusion.

## A

In their § 804(b) claim, the Morrises allege that the HOA "discriminate[d] against [them] in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of . . . religion." 42 U.S.C. § 3604(b). To prevail at trial, the Morrises needed to "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the HOA and that the HOA's actions "adversely affected the [Morrises] in some way." *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)). Here, a jury found that the Morrises had carried that burden, and so our review is limited to asking whether any reasonable jury could so find. FED. R. CIV. P. 50(a). Bearing in mind our

obligation to construe the evidence in the light most favorable to the Morrises, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554 (1990), I conclude that sufficient evidence was presented to allow a reasonable jury to find that the HOA had violated § 804(b).

The jury could properly have found that the HOA's actions adversely affected the Morrises based on either of two factual predicates. First, the jury could reasonably have concluded that, before the Morrises had closed escrow on their home, the HOA ginned up significant opposition to the Morrises among their neighbors through false and misleading communications. Second, the jury could reasonably have found that, before the Morrises closed escrow, the HOA singled them out for future selective, by-the-book enforcement of the CC&Rs. And on either theory, the jury could also reasonably have concluded that the HOA's conduct was motivated by the Morrises' religion and their outward expression of it. I address each of these three points in turn.

## 1

There can be little doubt that an HOA violates § 804(b) if, upon learning that a particular family is about to purchase a home in the neighborhood, the HOA actively fosters significant animosity toward that family in the neighborhood and does so based on a protected characteristic, such as religion or race. On this record, a jury could reasonably find that the HOA did just that.

The HOA made multiple statements to residents of the neighborhood that would reasonably be expected to generate hostility toward the Morrises in advance of their move to West Hayden Estates. The most significant example of this was the letter announcing the February 2015 "Emergency

Special Meeting" of the full HOA. A reasonable jury could conclude that this notice exaggerated the scope of the Morrises' planned event and cast it in a false and unduly negative light. For example, the board suggested that the program might run as long as ten days, involve three or more hours of amplified noise, and flood the neighborhood with nearly a thousand new cars. It also stated that the event would bring in "up to 80 volunteers," despite lacking any basis for that claim—prior events had at most 48 volunteers. The board further attempted to paint the Morrises as lawless, suggesting that they refused to obtain necessary permits from the county. At the same time, the letter characterized Jeremy as litigious and portrayed the board as "fearful" victims of his bullying. It cast him as a financial threat to the neighborhood through the risk of "additional legal costs" resulting in "increased assessments" against everyone in the development.

Moreover, a reasonable jury could conclude that the board's behavior was more consistent with making the Morrises unwelcome than with accomplishing its professed goal of ensuring compliance with the CC&Rs. The jury could determine that, rather than simply taking measures in the ordinary course to enforce the CC&Rs, the board undertook to foster significant resentment toward the Morrises. To take just one example, despite the board having authority to act on behalf of the HOA, its notice about the February 2015 special meeting asked residents to complete a proxy voting form if they could not attend. But no vote was needed by the members of the HOA—any member of the HOA could have unilaterally enforced the CC&Rs against the Morrises. Further, the board's framing of the vote as whether the residents "want[ed] [the Christmas event] to take place," rather than whether the event violated

the CC&Rs or otherwise warranted action, supports an inference that the board was affirmatively acting to generate hostility towards the Morrises in the development. The board therefore conducted a needless straw poll, participation in which it construed as "crucial," and converted the February meeting into a neighborhood referendum on the Morrises, whom the HOA members at the meeting unanimously spurned.

The jury could also find that the board's actions had predictable consequences. After arriving in the neighborhood, the Morrises were subjected to harassment from the other residents, including a death threat from Larry Bird. Contrary to the district court's and majority's dismissal of Bird's threat, *see* Opin. at 32–34, Bird's comments represented a genuine threat to the Morrises. Bird told Kristy that "we have enough guns and ammunition that will take care of you," and he warned her that he could evade protection she might seek. The district court erred in dismissing the Morrises' account of Kristy's encounter with Bird as "embellished," because courts may not make credibility assessments when ruling on a Rule 50(b) motion. *Go Daddy Software*, 581 F.3d at 961. Moreover, there was evidence that Bird's death threat caused the Morrises significant fear, including causing them to obtain concealed carry permits to protect themselves. And a reasonable jury could conclude that there was a causal relation between the board's actions and Bird's conduct.

Although the district court ultimately excluded the evidence of Bird's threat as irrelevant, that was an abuse of discretion. *See Hoffman v. Construction Protective Servs., Inc.*, 541 F.3d 1175, 1178 (9th Cir. 2008). The district court concluded that the evidence was irrelevant because it viewed the Morrises as attempting to impose liability on the HOA

for the threat itself.  The court therefore found it dispositive that "West Hayden could not be liable for conduct by non-party homeowners."  But that decision is legally erroneous when applied to *this* theory of liability, *viz.*, that the HOA ginned up neighborhood resentment toward the Morrises. On that understanding, Bird's threat is directly relevant as a foreseeable consequence of the HOA's conduct in violation of § 804(b).  It is probative of, among other things, the foreseeably harmful nature of the adverse action itself as well as the measure of damages suffered by the Morrises. And both of those items are material to the § 804(b) claim. Under *this* theory of § 804(b) liability, then, the Bird evidence is clearly relevant, *see* FED. R. EVID. 401, and the district court abused its discretion by excluding it.

Other instances of harassment were less extreme, but still troubling.  At least some residents of the neighborhood referred to the Morrises as "the enemy."  One neighbor set up a laser pointer to shine through the windows of the Morrises' home and prevent them from sleeping.  Others vandalized the Morrises' Christmas lights, or feigned injury to harm the Morrises' reputation.  And still others shouted obscenities at the Morrises and their visitors repeatedly.  On at least one occasion, the harassment escalated into physical confrontation, when a neighbor shoved one of the Morrises' volunteers at the Christmas event.  Contrary to what the district court thought, it is not dispositive that the offenders were not subject to the HOA's control and were not agents of the HOA.  In the context of this case, a jury could draw a reasonable inference that the HOA's ginning up of hostility towards the Morrises was a causal factor that foreseeably contributed to the level of animosity later directed toward the Morrises among their neighbors.

**2**

An HOA would likewise violate § 804(b) if, upon learning that a specific family was about to buy a home in their development, the HOA decided to single them out for an unprecedented level of by-the-book enforcement of the CCRs and did so based on a protected characteristic such as religion or race.  Once again, a reasonable jury could conclude that the HOA here did just that.

As an initial matter, the Morrises put forward substantial evidence of the HOA's history of lax enforcement of the CC&Rs.  For example, the HOA itself hosts an annual block party in the neighborhood, involving the closure of multiple streets for significant periods of time.  Similarly, the HOA permits an annual Fourth of July party, involving the launch of significant numbers of allegedly illegal fireworks over a period of several hours.  The Fourth of July party continues, seemingly without disruption by the HOA, even though it extends at times beyond midnight and even though it has been interrupted by police who have issued warnings to the hosts.  The Fourth of July events would have given rise to potential violations of multiple CC&R provisions, including § 5.1.17's prohibition on violations of state and local law, § 5.4.2's prohibition on "noise or other nuisance[s]," and § 5.4.9's prohibition on "unsafe or hazardous" activities.  A jury could similarly find that the HOA has permitted individual residents to host large events that violated the terms of the CC&Rs.  The Breazeals, prior to selling their home, would host weekly parties during football season involving as many as 80 guests and up to 50 vehicles parked along the roads of the neighborhood.  And the Breazeals' football parties would have implicated both § 5.1.4's parking regulations and § 5.4.2's bar on nuisances.  None of

the other events prompted so much as a warning by the HOA.

A reasonable jury could find that, in contrast to this history of lax enforcement, the HOA decided, prior to the sale of the Breazeals' home to the Morrises, to review the Morrises' anticipated compliance with the CC&Rs with a hyper-rigidity that reflected differential, if not pretextual, adverse treatment.  Indeed, such an inference is supported by the fact that, for example, several members of the HOA board themselves clearly thought that the HOA's objection to the planned Christmas lights was bogus.[3]

**3**

There was also sufficient evidence for the jury to find for the Morrises on the second element of their § 804(b) claim— *viz*., that the HOA's adverse actions against them were motivated in part by the Morrises' religion.  *Pacific Shores*, 730 F.3d at 1158.

---

[3] The majority concludes that, because the HOA ultimately did not bring an enforcement action against the Morrises (at least not until the Morrises first sued the HOA), the Morrises were not sufficiently "adversely affected" by the HOA's conduct.  *See* Opin. at 17–18.  That is wrong.  A reasonable jury could conclude that, even before the Morrises closed escrow on their home, the HOA had decided to take a much stricter approach towards enforcing the CC&Rs against them and that this selectively tougher approach was reflected in distinctive procedural hassles "that were contrary to the [HOA's] established policy and practice."  *Harris v. Itzhaki*, 183 F.3d 1043, 1052 (1999).  As our decision in *Harris* confirms, the fact that these differential processes did not result in an actual enforcement lawsuit does not mean that they did not constitute an adverse effect.  *See id*. at 1049, 1052 (landlord's service of three-day eviction notices, in departure from established practice, resulted in adverse effects even though the landlord did not follow through with eviction).

First, the Morrises provided evidence that the HOA was aware of their faith at the time it was making the relevant pre-sale decisions.  In the initial conversations with Scott, Jeremy informed her of his religious beliefs and the religious motivation for the program.  Scott confirmed that she passed that information along to the remainder of the board. Statements by board members suggested that they were hostile to the Morrises' outward displays of their religion. For instance, board members expressed distaste at the idea of the Morrises "push[ing] their religious beliefs" on the community.  Moreover, two separate presidents of the HOA made statements suggesting that members of the HOA board had acted with a religious animus:  Scott remarked that members of the HOA board "just don't want [Jeremy] there" and Taylor commented that "someone in this association doesn't like Christmas."  The jury therefore had evidence that the HOA board was aware of the Morrises' religion and had evidence *from members of the HOA board itself* that the Morrises' religion may have motivated the HOA's conduct.

Second, the board's January 16 letter provides further evidence of religious animus.  The initial draft of the letter referred to those who would visit the Morrises' Christmas program as "riff-raff" and "those kind."  The draft likewise suggested that the presence of "avowed atheists" in the subdivision made the Morrises' expression of faith undesirable.  The final letter continued to refer to potential adverse reaction to a religiously motivated Christmas program and it described potential visitors to that program as "undesirables."  A reasonable jury could read this language in the letter as indicating a hostility by the HOA toward Christians who outwardly express and celebrate their religion, which would include the Morrises and many of those likely to attend the Morrises' event.  The majority

reads the letter differently, arguing that "the concern expressed regarding 'undesirables' was that 'hundreds' of non-resident visitors driving through the neighborhood might include unruly individuals." Opin. at 40. But requiring the Morrises to show that there is no alternative way to read the letter, as the majority does, is precisely the opposite of how we are supposed to review Rule 50(b) motions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

Third, the HOA board itself disclaimed caring about many of the CC&R violations it later suggested were so damaging. For example, in her call with Jeremy, Scott stated outright that "nobody cared about the Christmas lights." That sentiment was echoed at the later meeting with the board, where Taylor told Jeremy that he did not think the CC&Rs regulated Christmas lights at all. And similar issues arise with respect to the board's focus on traffic, which several members indicated would be obviated by the Morrises' proposed traffic plan. These considerations provide further circumstantial support to a reasonable and permissible inference that the board's conduct was motivated by, or even a pretext for, religious-based discrimination.

Taken together, there is an ample evidentiary basis in the record for a reasonable jury to conclude that the HOA's adverse actions against the Morrises were motivated at least in part by the Morrises' religion. Accordingly, I would reverse the district court's entry of judgment as a matter of law on the § 804(b) claim.

**B**

The district court also determined that the HOA was entitled to judgment as a matter of law on the Morrises' § 804(c) claims. Construing the evidence in the light most favorable to the Morrises, *see Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013), I conclude that the jury's verdict was permissible in light of the evidence, and that the district court's grant of judgment as a matter of law should therefore be reversed.

Proving a violation of § 804(c) requires showing that the defendant "ma[d]e, print[ed], or publish[ed]" a "notice, statement, or advertisement"; that the publication was "with respect to the sale or rental of a dwelling"; and that the publication indicated "any preference, limitation, or discrimination based on . . . religion." 42 U.S.C. § 3604(c). It is undisputed that the HOA's letter to the Morrises was a "notice, statement, or advertisement" "ma[d]e, print[ed] or publish[ed]" by the HOA, or that it was "with respect to the sale or rental of a dwelling." *See id*. Thus, the question here is whether the jury could have reasonably concluded that the letter "indicate[d] a preference, limitation or discrimination" based on religion. *Id*. The answer to that question is yes.

The January 16 letter contained multiple statements that could be construed by a reasonable jury as indicating a "preference, limitation, or discrimination based on . . . religion." 42 U.S.C. § 3604(c). The letter explicitly expressed concerns about the interaction between the Morrises' public profession of their Christian faith and the views of "non-Christians or [those] of another faith." Read in light of the board's statements that it worried about the Morrises pressing their beliefs on others in the neighborhood, a reasonable jury could have concluded that

the letter expressed the board's preference for a purchaser who did not *outwardly* express his religious beliefs. *Cf. Masterpiece Cakeshop, Ltd. v. Colorado C. R. Comm'n*, 584 U.S. 617, 634 (2018) (finding "clear and impermissible hostility toward . . . sincere religious beliefs" in the context of a Free Exercise Clause claim where state actors "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere").

The board's letter also referred to the people the Morrises' Christmas program would attract as "undesirables." Given that the primary visitors to the event would presumably be other Christians wishing to join a public celebration of Christmas, a reasonable jury could have concluded that that language expressed a view that such religiously active and publicly expressive Christians were "undesirable." The majority claims that "undesirables" is instead best read to refer to "unruly individuals," *see* Opin. at 40, but that sort of weighing of circumstantial inferences is inconsistent with the standards applicable to review of jury verdicts under Rule 50. *Barnard*, 721 F.3d at 1075.

The district court's analysis of the letter reflected an even more egregiously impermissible weighing of the inferences. The district court simply adopted wholesale the HOA's reading of the letter, notwithstanding the reasonable inferences to the contrary. Thus, the district court ignored the letter's troubling reference to the Morrises' public display of their Christian faith, instead pointing to the fact that the letter also included a disclaimer that stated, "It is not the intention of the Board to discourage you from becoming part of our great neighborhood." The district court likewise tendentiously read the letter as merely reflecting an innocent goal of achieving religious pluralism. But appending "I am not discriminating" to the end of an otherwise discriminatory

statement does not preclude a jury from drawing a reasonable inference of discrimination.

Because a reasonable jury, construing the evidence in the light most favorable to the Morrises, could have concluded that the HOA expressed a "preference, limitation, or discrimination" against the Morrises' religion, I would reverse the district court's grant of judgment as a matter of law to the HOA on the Morrises' § 804(c) claim.

### III

A district court "may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976) (internal citations and quotations omitted). The district court's decision to conditionally grant a new trial under Federal Rule of Civil Procedure 59 is subject to review for abuse of discretion. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 845 (9th Cir. 2014).

Our standard for reviewing alleged abuses of a district court's discretion follows a two-step framework. First, we review de novo whether the district court identified and applied the correct legal rule. *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009). If it failed to do so, it abused its discretion and our review ends. *Id.* at 1262. If, however, the district court applied the correct legal rule, we review its analysis to determine whether it was "illogical", "implausible", or "without support in inferences that may be drawn from the facts in the record." *Id*. (internal quotation omitted). In conducting this review, we do not ourselves

enjoy a similar authority to reweigh the evidence or assess the credibility of witnesses. *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010). We are bound to uphold the district court's assessment unless it is clearly erroneous. *Hinkson*, 585 F.3d at 1259–60. In my view, the district court's new trial order was an abuse of discretion under these standards.

One of the grounds given by the district court in granting a new trial was its belief that, "despite the Court's instructions," the jury "undoubtedly considered" the "threats made to the [Morrises] and the Christmas program attendees," including Bird's "death threat," that the court had initially allowed but then ordered stricken. This reasoning is flatly at odds with the strong presumption that juries obey curative instructions given at trial. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). But more importantly, it is predicated on a fundamental error: as I have explained, the district court abused its discretion in striking that evidence in the first place. *See supra* at 89–90. The district court's mishandling of this evidence taints its overall assessment of the case, requiring that its new trial order be set aside.

The district court also justified its grant of a new trial based on its across-the-board assertion that all of the HOA's witnesses were credible and all of the Morrises' witnesses were not. On that basis, the court presumably concluded that the jury's verdict was "contrary to the clear weight of the evidence," *Hanson*, 541 F.3d at 1359, thereby warranting a new trial. In my view, the court's reasoning on this score was "illogical" and cannot stand. *Hinkson*, 585 F.3d at 1262.

The district court's order indicates that it made class-wide judgments as to the credibility of each side's witnesses based on its assessment of a single witness for each side— namely, Jeremy for the Morrises, and Scott for the HOA.

Thus, after finding Jeremy "not credible" and Scott "convincing and credible," the court announced that its "evaluation of their respective testimony is representative of its evaluation of the witnesses in the case more broadly." Given the more nuanced record in this case, this unexplained class-wide approach to witness credibility was an abuse of discretion. As the above detailed description of the trial record makes clear, there were stronger and weaker aspects to the testimony of particular witnesses for each side. Given that context, a simplistic wholesale rejection of *all* of one side's witnesses and evidence based on little more than a wholesale rejection of *one* of that side's witnesses—coupled with an equally blunderbuss mirror-image acceptance of the entirety of the other side's testimony—is a clear abuse of discretion.

Accordingly, I would reverse the district court's decision to award the HOA a new trial under Rule 59.

## IV

In appropriate cases, the district court possesses a limited authority to require the plaintiff to make a choice between accepting an award of lower damages or receiving an order for a new trial. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). Such a "remittitur" order is ordinarily appropriate when "there is no evidence that passion and prejudice affected the *liability* finding," *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987) (emphasis added), but the jury's assessment of *damages* is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork," *Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986) (simplified).

In determining whether a remittitur is proper under these standards, the district court is bound to construe the evidence in the light most favorable to the prevailing party. *Fenner*, 716 F.2d at 603. Where the district court has ordered a remittitur, we review its decision for abuse of discretion. *Kode*, 596 F.3d at 613. We review both the underlying decision to grant a remittitur, *id.*, as well as the money damages offered in the remittitur order. *See D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

Here, the district court ordered remittitur on two grounds. First, it considered the jury's award of damages to be purely speculative. Second, it concluded that the jury improperly used its punitive damages award to grant the Morrises their legal fees. I would reverse the district court as to both grounds.

## A

The district court concluded that the jury's award of $60,000 in compensatory damages to the Morrises was "not supported by the evidence and [was] based on speculation." In particular, it noted that Jeremy was "the sole source of support" for the $60,000 figure and that he expressed that he was not "positive of that number." Because the damages were to compensate for a future event, *i.e.*, the costs of the Morrises' expected future move out of West Hayden Estates, and because Jeremy was not absolutely certain of their value, the district court concluded that the award of compensatory damages "was both speculative and not supported by the evidence." I disagree.

As an initial matter, this is not a case in which the jury awarded compensatory damages that exceeded the maximum value sustainable by the evidence produced at

trial.  *See D & S Redi-Mix*, 692 F.2d at 1249.  Jeremy testified that he estimated that his family's damages would be between $60,000 and $80,000, and the jury chose to award the lowest amount in that range.  A remittitur all the way down to a nominal award of $1 would therefore be warranted only if Jeremy's testimony of damages was insufficient to support *any* damages at all.  The district court thought that was the case here, but that is clearly wrong.

A plaintiff is not required to prove compensatory damages with absolute certainty.  Rather, he or she need only put forward *relatively* certain evidence of the scope of the harm suffered.  *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  The Morrises' evidence in this case, although limited, satisfied that requirement.

Jeremy testified that he anticipated the costs associated with moving out of West Hayden Estates would be between $60,000 and $80,000.  He clearly articulated his basis for calculating that value: it was the sum of "closing costs, plus moving, cleaning, and so on."  Moreover, there was an ample foundation for Jeremy to estimate that value.  He had purchased and moved into the home roughly four years prior, so he would have had personal knowledge of the fair market value of the house and of the transaction costs associated with a move.  He provided a standard and reliable basis for his estimate of the closing costs, namely, six percent of the sale price of the home.  And he was not required to present a precise itemized account of damages.  *See Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) ("[T]he rule that precludes the recovery of uncertain and speculative damages . . . applies only to situations where the fact of damage is itself uncertain.").  Because Jeremy was able to provide testimony estimating his damages within a

reasonable degree of certainty, there was no basis for the district court to conclude that the Morrises had suffered a total failure of proof on the measure of their damages. *See Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1006 (9th Cir. 1981) ("Once injury has been proven, the fact that damages are not susceptible to precise measurement does not preclude recovery.").

The district court's emphasis on the fact that the damages were based on a future contingent event was likewise misplaced. This is not a situation where future damages are uncertain and speculative because the plaintiff has introduced no evidence whether the plaintiff's anticipated contingency would come to pass. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 824 (9th Cir. 2001). To be sure, *Story Parchment* makes clear that damages may not be awarded where the fact of damage itself—entirely apart from the quantum of damage—is uncertain. *Story Parchment*, 282 U.S. at 562–63. But here, it was clear from the record that the Morrises' choice of home was contingent upon their ability to host their Christmas event. Had they known, prior to moving in, that they could not host the event, it is unlikely that they would have chosen this home. This, coupled with Jeremy's unrebutted testimony that they planned to move, was sufficient to create a "reasonable certainty" of the existence of future monetary harm to support compensatory damages under this theory. Accordingly, because the district court erred in concluding that the jury's award of compensatory damages was totally unsupported by the evidence, I would reverse its order of remittitur.

## B

The district court also erred in remitting the jury's award of $15,000 in punitive damages to $1. If the jury's award of compensatory damages here is upheld, the amount of punitive damages awarded would be well within permissible bounds. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Nonetheless, the district court concluded that the punitive damage award should be remitted to $1, because "the evidence in this case uniformly supports the Homeowners Association's version of events," and there was no "evidence suggesting that the Homeowners Association acted with an evil motive or was reckless or callous with respect to Plaintiff's rights." The district court concluded instead that the jury was likely attempting to smuggle an award of legal fees to the Morrises under the guise of an award of punitive damages. Each of these arguments fails.

The district court's conclusions that "the evidence . . . uniformly supports the Homeowners Association's version of events" and that there was no evidence of the HOA's malign intent are mistaken for all of the reasons that I have previously explained.

Moreover, the district court's conclusion that the jury likely defied the court's express instruction not to use punitive damages to award attorneys' fees was wholly speculative and unsupported by the trial record. As previously noted, there is a strong presumption that juries follow instructions given at trial, *see supra* at 98, and there is no basis in the record for finding that that presumption was rebutted here. The district court noted that the jury announced its verdict "[w]ithin minutes" of being told that it could not award legal fees, but that does not provide a

sufficient basis for concluding that the jury's modest punitive damages award was an illegal award of fees in direct violation of the jury's instructions.

## V

For the foregoing reasons, I would reverse the district court's entry of judgment as a matter of law, its grant of a new trial, and its order of conditional remittitur, and I would remand with instructions to enter judgment on the jury's verdict and to re-examine the counterclaim in light of the jury's findings.  To the extent that the majority does otherwise, I respectfully dissent.